William Harold MANCUSO, Petitioner–Appellant–Cross–Appellee,

v.

Ana M. OLIVAREZ, Respondent–Appellee–Cross–Appellant.

Nos. 00–16188, 00–16657.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 15, 2001.

Filed March 6, 2002.

Amended June 11, 2002.

Allison Claire, Assistant Federal Defender, Sacramento, CA, for the petitioner-appellant/cross-appellee.

Jean M. Marinovich, Deputy Attorney General, Office of the Attorney General, Sacramento, CA, for the respondent-appellee/cross-appellant.

Before: BEEZER, TROTT, and TALLMAN, Circuit Judges.

## ORDER

The opinion filed March 6, 2002, reported at 282 F.3d 728 (9th Cir.2002), is amended as follows: at page 737, delete the paragraph that begins "On habeas review, ..." and insert the following language:

On habeas review, Mancuso is entitled to habeas relief only if it can be estab-

lished that the alleged trial error had a substantial and injurious effect or influence on the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Thompson v. Borg,* 74 F.3d 1571, 1575 (9th Cir.1996).[1] In determining whether the error had a substantial and injurious effect, the Supreme Court has long held that:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See also Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993) (same).

Page 738, replace *"See Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997)" with *"See Rodriguez,* 125 F.3d at 744."

Page 738, replace *"See Thompson v. Borg,* 74 F.3d 1571, 1574 (9th Cir.1996)" with *"See Thompson,* 74 F.3d at 1574".

Page 738, begin a new paragraph with the sentence reading, "The potential for prejudice is heightened when a juror interjects into the deliberations ..." and ending with "... that jurors will bring their life experiences to bear on the facts of a case")."

Page 742, paragraph beginning, "Prior to trial, defense counsel moved to exclude any reference to that fact that ..." change to read, "Prior to trial, defense counsel moved to exclude any reference to the fact that ...."

With these amendments, the panel has voted unanimously to deny the petition for rehearing and the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

---

1. We recognize that our prior decisions have not consistently interpreted or applied the *Brecht* standard. We have stated that a petitioner bears the burden of showing that a trial error had a substantial and injurious effect. *Thomas v. Hubbard,* 273 F.3d 1164, 1170 (9th Cir.2002) (as amended); *Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997); *Franklin v. Henry,* 122 F.3d 1270, 1273 (9th Cir.1997). We have also stated the converse, that the government bears the burden. *Keating v. Hood,* 191 F.3d 1053, 1062 (9th Cir. 1999) (as amended); *Fisher v. Roe,* 263 F.3d 906, 917 (9th Cir.2001). And in other instances, we have stated as we do here that the reviewing court must determine independently whether a trial error had a substantial and injurious effect, without consideration of burdens of proof. *Gray v. Klauser,* 282 F.3d 633, 651 (9th Cir.2002); *Thompson,* 74 F.3d at 1575. We hold that the last statement most accurately reflects current Supreme Court case law.

The Supreme Court has made clear that whether a trial error had a substantial and injurious effect is not to be analyzed in terms of burdens of proof. *O'Neal,* 513 U.S. at 436–37, 115 S.Ct. 992. We, as the reviewing court, have the responsibility to determine this legal question "without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial." *Id.* at 437, 115 S.Ct. 992 (quoting R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 26 (1970)); *see also Simmons v. Blodgett,* 110 F.3d 39, 42 (9th Cir.1997) ("Finding facts to determine if there is a constitutional error is a wholly different thing from deciding whether or not an error, once found, affected the verdict.") (as amended). The "conceptually clearer" question is to ask "Do [we, the judges on habeas review], think that the error substantially influenced the jury's decision?" *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992.

The petition for rehearing and the suggestion for rehearing en banc are DENIED.

## OPINION

TALLMAN, Circuit Judge.

Respondent Ana M. Olivarez appeals the district court's order granting, in part, California state prisoner William Mancuso's 28 U.S.C. § 2254 habeas petition on the ground of juror misconduct. Mancuso cross-appeals the district court's denial of five of his remaining claims for relief. We have jurisdiction under 28 U.S.C. §§ 1291 & 2253. Because we deny the habeas corpus relief awarded by the district court as to the juror misconduct claim, we reverse, in part, and affirm the remainder of the district court's order.

## I

Mancuso was convicted in 1980 of first degree murder and robbery. The California Court of Appeal summarized the facts surrounding the murder as follows: [1]

In mid-April 1978, defendant made three visits to Hurst Auto Wreckers in Sacramento in an attempt to construct a silencer for a firearm.

\* \* \*

On one of defendant's visits to the yard, he was observed to be in possession of a .32 caliber automatic handgun with a threaded barrel.

At about 1 a.m. on May 30, 1978, defendant entered the Tradewinds Bar in Sacramento. Soon afterwards another patron, Marcie Crooks, entered; at that time the only other person present was the bartender, Dale King.

Crooks and defendant conversed; defendant asked her if she knew a person named Steve, describing him as a " 'little fat short guy, fat and short, and he used to work here.' " Defendant was describing Stephen Christensen, a friend of defendant's who had been employed at the bar in the spring of 1978. Crooks said she remembered him. Defendant told her Steve had made out a $270 check to Curt Thomas, the bar owner, and that Thomas was " 'really mad about it.' " He repeated several times that Thomas was angry. Crooks suggested that it was hard to collect on a check after 90 days; defendant replied, " 'Well, there are other means.' "

Crooks departed shortly before the bar closed at 2 a.m., leaving King and defendant alone. Before leaving she noticed the outline of an automatic handgun at defendant's hip.

After Crooks left, King saw defendant fitting a silencer to a .32 caliber automatic handgun. King put his hands up but defendant told him to put them down. He said he was there "on a contract" and " 'If this goes all right,' ... 'I will leave you alive in the bathroom.' " Defendant ordered King to the bar's telephone, telling him to call Curt Thomas and fabricate a story to get Thomas to come to the bar. King did as ordered, calling Thomas at home and saying he could not find the keys to the front door.

After the call, defendant ordered King behind the bar and told him, " 'I know you're married and got kids by your conversation ... with that lady that was just in here.' " He took King's driver's license, saying " 'I am not in this thing alone.' " " 'If everything goes all right,' ... 'you're going to [be] left alive.' " He said he would send King the driver's

---

**1.** For purposes of this appeal, the state court's determinations of historical fact are presumed correct. *See* 28 U.S.C. § 2254(d) (1994).

license in about a week " 'if everything comes out all right[.] ...' "

Thomas could eventually be heard approaching. Defendant had King turn down the lights. When Thomas entered defendant ran behind him, yelled, " 'You fucked over your last dude, you should have paid up, prick,' " and killed him with two shots to the chest. King, who had dropped to the floor, then heard defendant say, " 'I got your gun now, prick,' " and saw defendant put something in his belt. Defendant went through Thomas' pockets and wallet, then put the gun to Thomas' head and fired once again.

After removing money from the bar's cash registers defendant told King they were going to "the house" for "the big money." He was referring to the Thomas' house behind the bar. Defendant directed King to walk in front of him to the house, instructing King to get Thomas' wife to the door and tell her there had been trouble in the bar. However, finding the house empty, the two men walked back to the bar. On their way back, they worked out a description King could give police of the killer. King said he would say the man was 200 pounds, 5 feet 7 inches, and that he said he was from the Alcoholic Beverage Control. Defendant told King to say the man was Mexican or Italian.

Back at the bar, defendant produced a set of handcuffs and had King handcuff himself to a waterpipe under the bathroom sink. Defendant again threatened, " 'I ain't in this thing alone. I got a friend sitting outside in a car.' ... 'I am going to leave in a few minutes,' ... 'If you yell or scream or try to get out of here, he's going to come in here and finish you.' " He added, " 'I'll be checking the papers,' ... 'If everything comes out all right, you tell them exactly what you told me you were going to tell them,' ... 'You'll get your driver's license back

in a week.' " He told King that if King did not make any noise he would call the police in about an hour and tell them King was there. Defendant left, then returned and said, " 'Well, I am going to leave now, and don't forget my friend is going to stay out there for a while.' "

Twenty minutes later King worked himself loose and summoned the police. When they arrived, he told them a man from the Alcoholic Beverage Control came to the bar, forced him to call Thomas, then locked him in the bathroom before shooting Thomas. He described the man as 5 feet 7 inches, 200 to 220 pounds, and Caucasian.

At about 3 a.m., defendant called the Sacramento Police Department, identified himself as Joseph Murphy, and reported that a murder had taken place at the Tradewinds Bar, giving a description of the assailant that fit Stephen Christensen.

Later that day (May 30), after Crooks learned of Thomas' murder, she gave a statement to investigators and assisted in putting together a composite drawing and sketch of defendant.

Two days after the murder, King's ex-wife received an anonymous telephone call threatening King's life. King was told of the call that day. The next day King was picked up on a parole violation and jailed. In exchange for his release, he vowed to tell authorities the truth about the Tradewinds killing and implicated defendant.

Toward the end of June 1978, Stephen Christensen, while in his girl friend's apartment, fired an automatic handgun with a silencer attached. Christensen claimed to have made the silencer. A police department criminalist later identified that weapon as the handgun used to kill Curt Thomas.

In mid-June defendant learned that police were looking for Christensen and had a composite drawing resembling defendant; he went to Christensen's girl friend's apartment, and told her that Steve was holding something for him. Later that month, defendant assisted Christensen's girl friend and her sister in bailing Christensen out of jail. The following morning, the girl friend heard defendant ask Christensen about a gun. When Christensen indicated he had gotten rid of it, defendant said, " 'Well, we are going to have to get it back.' "

On June 24, defendant was arrested at his apartment. A search of his bedroom closet produced a matchbook from the Tradewinds Bar and the jacket worn by defendant on the night of the killing. In a dresser drawer in the bedroom officers found two sketches of a silencer, one of which defendant had shown to the ... auto wreckers in April. They also found an invoice from a machine shop for six aluminum washers, bearing Stephen Christensen's name and signature. The invoice was dated April 10, 1978. The officers also searched defendant's car. Under a towel on its front seat they found a loaded .45 caliber automatic handgun. This weapon was later determined to be Thomas'.

Later that day, at the sheriff's office, defendant was placed in an interview room prior to booking where he was left alone for several minutes. When the deputy returned, he found the room filled with smoke, and a partially burned business card in an ashtray. Later analysis revealed the card was from a machine shop.

That afternoon defendant was placed in an isolation cell. There he summoned a jail trusty and asked him to call his (defendant's) wife and tell her to check in the seats of their car; defendant said he wanted her to look for a "gold clip." The next day, June 25, defendant's wife visited him at the jail. In their conversation, which was secretly recorded, defendant told her: " 'That if he says it is me and then they find the thing in the car and it matches the guy that was dead things, you know, look bad.' " He also said: " 'The hell with him saying it looks like me. You know, I don't care about that. That don't mean nothing.' ... 'Okay. The next one is to get the gun suppressed. If that's suppressed, I got a good, good chance. See, the only thing the jury would hear is this guy saying that I was there, and then hear eight people saying I was not there.' "

*People v. Mancuso,* No. 3 Crim. 10984 (Cal.Ct.App. Nov. 4, 1982) (order affirming conviction).

Mancuso's jury trial lasted more than one month. During that time, the jury heard thirty-one days of testimony from more than one hundred witnesses. In support of its case, the State presented the following evidence against Mancuso: eyewitness testimony of Dale King; testimony regarding Mancuso's efforts to construct a silencer; testimony of Marcie Crooks, a student intern with the Sacramento County Sheriff's Department, to the effect that Mancuso was carrying a handgun on the night of the murder; testimony regarding Mancuso's post-arrest attempts to destroy evidence; and the fact that the handgun used to kill Thomas was found in Mancuso's car after the murder.

In his defense, Mancuso testified that he had been a witness to the Tradewinds killing, and that Stephen Christensen had committed the crime.[2] He also alleged that he was being framed by Christensen,

---

**2.** According to the district court record, both Mancuso and Christensen were originally charged with Thomas' murder. The State dismissed the charges against Christensen, however, prior to Mancuso's trial.

and co-conspirators King and Lequeta Thomas. The United States Magistrate Judge summarized the details of Mancuso's defense as follows:

> Petitioner testified that although he was present during the shooting of Curt Thomas, the murder was committed by Steve Christensen in conspiracy with Dale King and Thomas' wife, Lequeta Thomas .... Petitioner also testified that Christensen committed the murder for $5,000 ..., that Christensen had been in jail ..., that Christensen had ties with the Mafia ..., and that Christensen was a substance abuser .... The jury heard testimony about the character and criminal history of the persons petitioner claimed were responsible for the murder. In this regard, testimony was introduced by the defense that Christensen had offered money to an inmate at the Sacramento County Jail to have a defense witness killed .... During the cross-examination of Dale King, the jury learned of some of King's criminal history ... and use of heroin ....

*Mancuso v. Olivarez*, No. 96–0787 (E.D. Cal. April 12, 2000) (Findings and Recommendation).

On the twelfth day of testimony, evidence of Mancuso's parole status was inadvertently admitted over the court's prior in limine order. Defense counsel moved for a mistrial. The motion was denied and the jury was instructed to disregard the inadmissible testimony.

On May 28, 1980, the jury began its 7-day deliberation. On the second day, the jury requested that the testimony of King and Mancuso be read back to them. After several days of rereading, the jury requested that additional testimony be reread and made a further inquiry.

The jury found Mancuso guilty of first-degree murder and robbery on June 5, 1980. It also found the following four special circumstances "Not True": 1) that the murder of Thomas was willful, deliberate and premeditated; 2) that Mancuso was personally present during the commission of the act or acts causing death; 3) that Mancuso, with the intent to cause death, physically committed the act or acts causing death; and 4) that the murder was committed while Mancuso was engaged in the commission of a robbery.

After the jury verdict, defense counsel moved for a new trial on several grounds, including juror misconduct. That motion was denied, and Mancuso appealed. The Third Appellate District of California rejected Mancuso's juror misconduct claim, among others, and affirmed his conviction. The California Supreme Court denied review without comment.

Between 1986 and 1996, Mancuso filed two habeas petitions in federal district court. Both petitions were dismissed for failure to exhaust state court remedies. Mancuso apparently continued to exhaust his claims in the California state courts.[3] Mancuso filed the present petition on April 19, 1996. The petition was amended on September 13, 1996, and was assigned to United States Magistrate Judge Dale Drozd for findings.

Judge Drozd filed his Findings and Recommendations in April 2000, recommending that the district court grant Mancuso relief on the juror misconduct claim and deny relief on the remaining eight claims. Chief United States District Judge Lawrence Karlton adopted the Findings and Recommendations in their entirety. This appeal and cross-appeal followed.

## II

We review de novo the district court's decision to grant or deny a petition

---

3. There is no dispute that Mancuso has exhausted his state court remedies.

for a writ of habeas corpus. *See DePetris v. Kuykendall,* 239 F.3d 1057, 1061 (9th Cir.2001). We also review de novo the issue of juror misconduct, *see Sassounian v. Roe,* 230 F.3d 1097, 1108 (9th Cir.2000), and claims of ineffective assistance of counsel, *see Jackson v. Calderon,* 211 F.3d 1148, 1154 (9th Cir.2000), *cert. denied,* 531 U.S. 1072, 121 S.Ct. 764, 148 L.Ed.2d 665 (2001). The district court's factual findings, however, are reviewed for clear error. *See Solis v. Garcia,* 219 F.3d 922, 926 (9th Cir.2000), *cert. denied,* —— U.S. ——, 122 S.Ct. 94, 151 L.Ed.2d 55 (2001).

■ Substantive review of this petition is governed by pre-Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standards and precedent because Mancuso filed his petition prior to the effective date of AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Sassounian,* 230 F.3d at 1105.

### III

Mancuso claims his Sixth Amendment right to a fair and unbiased jury was violated when the jury was exposed to prejudicial extrinsic information during the trial and during jury deliberation. He specifically contends that: 1) at trial, a witness improperly referred to a parole search of Mancuso's apartment; and 2) during jury deliberations, the foreperson announced

his belief that Mancuso had committed a prior felony, or felonies, which information he gained after tampering with a trial exhibit. Because credibility determinations were dispositive in this case, Mancuso asserts that the improper reference to the "parole search" coupled with the foreman's misconduct undermines the reliability of the verdict.

■ Under the Sixth Amendment, Mancuso has a federal constitutional right to an impartial jury, the right to confront those who testify against him, and the right to conduct cross-examination. *See Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to jury trial); *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (Sixth Amendment right to confront witnesses and conduct cross-examination); *Turner v. Louisiana,* 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (Sixth Amendment right to trial by jury in which the jury verdict is based on evidence produced at trial).

■ On habeas review, Mancuso is entitled to habeas relief only if it can be established that the alleged trial error had a substantial and injurious effect or influence on the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Thompson v. Borg,* 74 F.3d 1571, 1575 (9th Cir.1996).[4]

---

**4.** We recognize that our prior decisions have not consistently interpreted or applied the *Brecht* standard. We have stated that a petitioner bears the burden of showing that a trial error had a substantial and injurious effect. *Thomas v. Hubbard,* 273 F.3d 1164, 1170 (9th Cir.2002) (as amended); *Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997); *Franklin v. Henry,* 122 F.3d 1270, 1273 (9th Cir.1997). We have also stated the converse, that the government bears the burden. *Keating v. Hood,* 191 F.3d 1053, 1062 (9th Cir. 1999) (as amended); *Fisher v. Roe,* 263 F.3d

906, 917 (9th Cir.2001). And in other instances, we have stated as we do here that the reviewing court must determine independently whether a trial error had a substantial and injurious effect, without consideration of burdens of proof. *Gray v. Klauser,* 282 F.3d 633, 651 (9th Cir.2002); *Thompson,* 74 F.3d at 1575. We hold that the last statement most accurately reflects current Supreme Court case law.

The Supreme Court has made clear that whether a trial error had a substantial and

In determining whether the error had a substantial and injurious effect, the Supreme Court has long held that:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See also Jeffries v. Blodgett,* 5 F.3d 1180, 1190 (9th Cir.1993) (same).

■ No bright line test exists to assist courts in determining whether a petitioner has suffered prejudice from juror misconduct. *See Rodriguez,* 125 F.3d at 744. We therefore "place great weight on the nature of the extraneous information that has been introduced into deliberations." *Id.* (citing *Jeffries v. Wood,* 114 F.3d 1484, 1490 (9th Cir.1997)). *See Thompson,* 74 F.3d at 1574(juror misconduct occurs when a juror introduces into the jury's deliberation a matter which was not in evidence or in the instructions).

■ The potential for prejudice is heightened when a juror interjects into the deliberations "objective extrinsic facts" regarding the accused because that juror becomes an unsworn witness who is not subject to either confrontation or cross-examination. *Jeffries v. Wood,* 114 F.3d at 1490. *See United States v. Navarro–Garcia,* 926 F.2d 818, 821–22(9th Cir.1991) (holding that a juror's personal knowledge or experience constitutes extrinsic evidence where the juror interjects his or her past personal experiences into deliberations in the absence of any record evidence on a given fact). While jurors may bring their life experiences to a case "it is clearly improper for jurors to decide a case based on personal knowledge of facts specific to the litigation . . . ." *Hard v. Burlington N. R.R.,* 870 F.2d 1454, 1462 (9th Cir.1989) (denying new trial where one juror used personal knowledge of x-ray interpretation to sway others because "[i]t is expected that jurors will bring their life experiences to bear on the facts of a case").

Here, the trial court prohibited the use or introduction of evidence regarding Mancuso's prior felony convictions or parole status at trial. The prosecution advised its witnesses accordingly. Nevertheless, Detective Gary Gritzmacher, the prosecutor's lead investigator on the Thomas murder, stated during cross-examination that he participated in a "parole search" at Mancuso's apartment. The trial judge had previously instructed Gritzmacher to simply state "yes" or "no" in response to the defense attorney's question. After Gritzmacher's inappropriate response, the trial judge called a recess.

Outside the presence of the jury the trial judge reprimanded Detective Gritzmacher. He questioned the propriety of Gritzmacher's response after he had been explicitly instructed not to mention that Mancuso was on parole. The trial judge stated that Gritzmacher's reference to a "parole search" indicated to the jury that

---

injurious effect is not to be analyzed in terms of burdens of proof. *O'Neal,* 513 U.S. at 436–37, 115 S.Ct. 992. We, as the reviewing court, have the responsibility to determine this legal question "without benefit of such aids as presumptions or allocated burdens of proof that expedite factfinding at the trial." *Id.* at 437, 115 S.Ct. 992(quoting R. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 26 (1970)); *see also Simmons v. Blodgett,* 110

F.3d 39, 42 (9th Cir.1997) ("Finding facts to determine if there is a constitutional error is a wholly different thing from deciding whether or not an error, once found, affected the verdict.") (as amended). The "conceptually clearer" question is to ask "Do [we, the judges on habeas review], think that the error substantially influenced the jury's decision?" *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992.

Mancuso was an ex-felon and could possibly have "destroy[ed] four months of work that's gone into this case." He then surmised that "[t]he officer's failure to follow instructions ha[d] jeopardized the entire trial." Nevertheless, the trial judge denied Mancuso's motion for a mistrial, and carefully instructed the jury to ignore Gritzmacher's statement.

Later in the trial, after Mancuso had testified, the prosecution sought to admit evidence of Mancuso's prior robberies. The trial judge denied the prosecutor's motion out of concern that admission of such evidence would ensure a guilty verdict based not on twenty-five days of testimony from over one hundred witnesses, but "on the one question of whether Mr. Mancuso has a bad character or not." Specifically, the trial judge stated:

> The jurors, having heard by the time we are through a hundred witnesses, will be faced with an almost too difficult task of deciding whether Mr. Mancuso is guilty or not guilty, or whether Mr. Christensen is the one who did the crime, and if they don't know anything about Mr. Christensen other than what they have heard, *we put Mr. Mancuso's record of three or four robberies in as similar offenses*, strikingly similar offenses, I think the outcome then becomes assured, and I think Mr. Mancuso would be convicted on the basis of the undue prejudice.

Transcript at 9539 (emphasis added).

After receiving instructions, the jury began its deliberation. On the second day of deliberations, the jury requested that all admitted exhibits be sent into the jury room, with the exception of a firearm and the currency. Mancuso's counsel objected to sending in the photograph of Christensen. Christensen's photograph had been admitted into evidence with the booking numbers covered with tape. The photograph of Mancuso was admitted into evidence with the booking numbers exposed. The trial judge sent the exhibits to the jury as they had been admitted into evidence.

During the course of the jury's deliberations Foreman Fitzgerald informed his fellow jurors that Mancuso had been convicted of a felony (or felonies) long ago. Foreman Fitzgerald deduced this fact by removing the tape at the bottom of the photograph of Christensen and comparing the Sacramento County Jail booking numbers on the bottom of Mancuso and Christensen's photographs. While Mancuso and Christensen had been arrested and booked on the same date, Mancuso's booking numbers were apparently lower. Fitzgerald believed the difference in the numbers reflected the fact that Mancuso had a longer record than Christensen. Foreman Fitzgerald gleaned this information from the booking numbers based upon his prior employment as a youth counselor with the California Department of Corrections.

A juror's personal knowledge of specific information concerning the defendant or the defendant's alleged crime constitutes impermissible extrinsic evidence. *See Jeffries v. Blodgett,* 5 F.3d at 1190 n. 2 (citing *Navarro–Garcia,* 926 F.2d at 821). *See also Jeffries v. Wood,* 114 F.3d at 1490. Here, Foreman Fitzgerald injected personal knowledge of facts specific to Mancuso that were not a part of the record. Such evidence was extrinsic to this case.

In order to determine whether the introduction of such extrinsic evidence constitutes reversible error, however, we consider the following factors:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether

the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Bayramoglu v. Estelle,* 806 F.2d 880, 887 (9th Cir.1986), *quoted in Jeffries v. Blodgett,* 5 F.3d at 1190(stating that "none of these factors should be considered dispositive").[5]

■ In this case, the extrinsic evidence—the testimony regarding the "parole search" and Foreman Fitzgerald's conclusion regarding the booking numbers—was actually received by the entire jury.[6] The reference to Mancuso's parole status was made on the twelfth day of thirty-one days of testimony, and the fact that Mancuso had a felony conviction was shared with the jury during its seven-day deliberation. Foreman Fitzgerald and Juror Anthony Taylor's affidavits further indicate that the jury did not discuss the extrinsic material at great length, but that such material was introduced before the verdict was entered.

■ Thus, it is the fifth factor that is determinative in this case—were there any other matters which may bear on whether the introduction of extrinsic material substantially and injuriously affected the verdict? Within the fifth factor, we conduct the following inquiries:

1. whether the prejudicial statement was ambiguously phrased; 2. whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; 3.

whether a curative instruction was given or some other step taken to ameliorate the prejudice; 4. the trial context; and 5. whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*United States v. Keating,* 147 F.3d 895, 902–03(9th Cir.1998) (footnote omitted); *Jeffries v. Wood,* 114 F.3d at 1491–92.

■ First, we consider the evidence regarding Detective Gritzmacher's reference to a "parole search." Gritzmacher's statements were not ambiguous nor cumulative of other evidence adduced at trial. *See Eslaminia v. White,* 136 F.3d 1234, 1239 (9th Cir.1998) ("[T]o be truly considered cumulative, there must be an extremely close relationship between the extrinsic evidence and the evidence actually admitted."). The jury was carefully admonished, however, to ignore Gritzmacher's statement and there is a strong presumption that the court's curative instruction was followed by the jury. *See Doe ex rel. Rudy–Glanzer v. Glanzer,* 232 F.3d 1258, 1270 (9th Cir.2000). In addition, the curative instruction was provided in the context of thirty-one days of testimony from more than one hundred witnesses. Any prejudice that might have occurred as a result was diluted by the copious testimony and satisfactorily ameliorated by the curative instruction.

The foreman's statements, while also unambiguous and not otherwise admissible, could not be cured with an instruction. We must therefore consider the fifth inquiry: whether the statement was *insufficiently prejudicial* given the issues and

---

**5.** The material that is bracketed in factor five reflects the prejudice standard set forth in *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710.

**6.** "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent

jurors. The bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial." *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998).

evidence in the case. We conclude that it was.

■ Juror misconduct cases in which habeas relief has been granted often ·involve the jury's receipt of information excluded from trial as unduly prejudicial such as evidence of the facts surrounding a defendant's prior conviction, bad reputation, or propensity to violate the law. *See Rodriguez,* 125 F.3d at 744. In all cases, the reviewing court must apply an objective test in evaluating the potential impact of the evidence on the jury. *See id.; Jeffries v. Blodgett,* 5 F.3d at 1191. The appropriate inquiry is whether there was a direct and rational connection between extrinsic material and the prejudicial jury conclusion, and whether the misconduct relates directly to a material aspect of the case. *See Rodriguez,* 125 F.3d at 744; *Jeffries v. Blodgett,* 5 F.3d at 1190; *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir.1988). *Cf. Lawson v. Borg,* 60 F.3d 608 (9th Cir.1995) (granting the petition where a juror improperly told the jury that the defendant was violent); *Jeffries v. Blodgett,* 5 F.3d at 1191 (granting the petition where the jury learned that the defendant had previously committed armed robbery); *Dickson,* 849 F.2d at 408–09(granting the petition after jurors were told that the defendant, on trial for bludgeoning a man to death with a pool cue, had "done something like this before").

Here, the jury never learned the prejudicial details of Mancuso's criminal history (e.g., that Mancuso's criminal record included three or four other robberies). They were told only that the foreman believed that both Christiansen and Mancuso had a criminal history, that Mancuso had been convicted of a felony, or felonies, "some time ago," and that Mancuso might have had a longer record than Christiansen. These general assertions were not substantial and injurious in the overall context of this trial. Moreover, the trial judge, who was aware of the prejudicial possibility of Mancuso's criminal record and took steps to prevent such evidence from going to the jury, did not believe a new trial was warranted after listening to all the evidence including the evidence of juror misconduct. *See United States v. Hanley,* 190 F.3d 1017, 1031(9th Cir.1999) (stating that special deference is accorded to the trial judge's impression of the impact of alleged juror misconduct).

There is no doubt that the jury's assessment of Mancuso and King's credibility was critical to its decision. In applying the objective standard in the context of this trial, however, we hold that the testimony regarding the parole search coupled with consideration of extraneous evidence that petitioner had a felony record did not have a substantial and injurious influence on the jury's verdict.[7] Because we hold that the jury's consideration of such extrinsic evidence was not unduly prejudicial in relation to the issues in this case, we reverse the district court's decision to grant the writ on this ground.

## IV

Petitioner also claims his trial counsel was ineffective because she agreed to withhold from the jury the fact that witnesses had been ·hypnotized and because she failed to impeach a witness for bias.

■ In order to succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's representation was deficient and that such

---

**7.** Of principal import in this inquiry is not whether there was enough evidence to support the verdict, apart from the error, but whether the error itself had a substantial influence on the jury's determination of the verdict. *See Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239.

deficiency prejudiced his or her defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's representation is considered deficient when his or her performance falls below "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. This standard requires that courts be deferential to counsel by making "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052.

Consistent with such deference is the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Defendants must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotations omitted). *See also Murtishaw v. Woodford,* 255 F.3d 926, 939 (9th Cir.2001) (stating that the defendant "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy").

Mancuso cannot overcome these presumptions. First, he contends he was deprived of his Sixth Amendment right to effective assistance of counsel when defense counsel agreed to withhold from the jury the fact that witnesses King and Crooks had been hypnotized. He argues that his counsel should have drawn upon the "wealth of expert opinion" available at that time in support of the proposition that hypnosis was not a guarantee of truth.

Prior to trial, defense counsel moved to exclude any reference to the fact that King and Crooks had been hypnotized. The government so stipulated. In addition, the trial judge remarked that if the parties had not so stipulated, he would have entered such an order, in light of the potential danger that the jury might assume that statements made while under hypnosis were more truthful than other statements. Fearing this prejudice, defense counsel chose to exclude all references to hypnosis. In fact, on the record, Mancuso's counsel agreed with the trial judge that the fact of King's hypnosis "in the mind of the trier of fact ... would be almost a guarantee of truth." [8]

Both defense counsel and the trial judge believed that the jury would presume that statements made under hypnosis were truthful. It was agreed that this would lend unwarranted credibility to such testimony. Mancuso nevertheless contends defense counsel should have worked to overcome the jury's presumptions and misconceptions regarding hypnosis, particularly in light of the abundance of information regarding the unreliability of hypnosis.

As stated above, Mancuso's counsel's decisions are entitled to deference. We will not second-guess such decisions or use hindsight to reconstruct the circumstances of counsel's challenged conduct. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *Guam v. Santos,* 741 F.2d 1167, 1169 (9th Cir.1984) (stating that a "tactical decision by counsel with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel"). Mancuso's argument that his counsel could have presented a better defense fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. In light of the record and facts in this case,

---

**8.** While King attended a hypnosis session and later testified at trial, it is unclear whether he was ever actually hypnotized. Because this fact is not critical to our review, we do not resolve this issue.

defense counsel made a reasonable and sound strategic choice to eliminate any references to King and Crooks' hypnosis sessions.

■ Mancuso also contends he was deprived of his Sixth Amendment right to effective assistance of counsel when his trial counsel failed to impeach Crooks for bias. Crooks was an intern at the Sacramento County Sheriff's Department and had been involved in the Mancuso investigation. Mancuso asserts counsel should have "used this information to highlight Crooks' occupational motive and interest in changing her testimony to conform to the suggestions from officers."

Mancuso's contention is unconvincing. During cross–examination Crooks stated that she was a student intern with the Sheriff's Department and that she wished to "help solve the case." Defense counsel also brought out the fact that Crooks did not mention in her original statement to the detectives that she had seen the outline of an automatic weapon in Mancuso's jacket pocket, but that she was now testifying to such facts.

Defense counsel's cross-examination and impeachment of Crooks' credibility placed her performance well within the wide range of professional assistance demanded of criminal attorneys. Again, Mancuso's suggestions regarding how defense counsel might have handled Crooks' cross-examination differently are insufficient to support an ineffective assistance of counsel claim.

We therefore affirm the district court's denial of petitioner's ineffective assistance of counsel claims.

## V

Mancuso asserts that the use of post-hypnotic testimony deprived him of his Sixth Amendment right to confront the witnesses against him. He contends that the hypnotic process itself undermines the ability to reliably test a witness' veracity on cross-examination because it hardens the witness' memories, whether or not such memories are uncertain or false. Because such memories remain unconscious, Mancuso asserts confrontation is impossible.

■ We have previously rejected this argument. The admission of post-hypnotic testimony does not violate the Sixth Amendment right to confrontation. *See United States v. Awkard,* 597 F.2d 667, 669 (9th Cir.1979) (holding "[t]he fact of hypnosis, if disclosed to the jury, may affect the credibility of evidence, but not its admissibility"); *United States v. Adams,* 581 F.2d 193, 198 (9th Cir.1978) (stating "that the fact of hypnosis affects credibility but not admissibility"). The United States Supreme Court has held, in the context of a previously hypnotized defendant, that "traditional means of assessing accuracy of testimony ... remain applicable." *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Thus, "[c]ross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies." *Id.*

Mancuso's argument that admission of post-hypnotic testimony *itself* is violative of his Sixth Amendment rights to confrontation and cross-examination has been rejected by this Circuit. The admissibility of such evidence, in general, has been upheld by the Supreme Court. We therefore affirm the district court's denial of Mancuso's Sixth Amendment Confrontation Clause claim.

## VI

■ Mancuso contends that the admission of King's unreliable post-hypnotic testimony violated his due process rights.

■ The Due Process Clause guarantees every defendant the right to a trial

that comports with the basic tenets of fundamental fairness. *See Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). A writ of habeas corpus will be granted for an erroneous admission of evidence only where the "testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

 Thus, in order to establish a due process violation based on the admission of erroneous evidence, Mancuso "must show that that error rendered the trial so 'arbitrary and fundamentally unfair' that it violated federal due process." *Pennywell v. Rushen*, 705 F.2d 355, 357 (9th Cir.1983) (quoting *Powell v. Spalding*, 679 F.2d 163, 166 (9th Cir.1982)).

As stated previously, at the time of Mancuso's trial, testimony based upon memories refreshed under hypnosis was admissible. *See Rock*, 483 U.S. at 44, 107 S.Ct. 2704; *Awkard*, 597 F.2d at 669; *Adams*, 581 F.2d at 198. Because the admission of hypnotically refreshed evidence is not at issue in this Circuit, "there is no need for a foundation concerning the nature and effects of hypnosis." *Awkard*, 597 F.2d at 669. We have specifically rejected the constitutional argument that "the in-court testimony of a witness who had earlier been subject to hypnosis is unreliable as a matter of law. . . ." *Adams*, 581 F.2d at 199.

Nevertheless, this Circuit has recognized that "[g]reat care must be exercised to ensure that statements after hypnosis are the product of the subject's own recol-

lections, rather than of recall tainted by suggestions received while under hypnosis." *Id.* at 198–99 (finding that "investigatory use of hypnosis on persons who may later be called upon to testify in court carries a dangerous potential for abuse").

 The only procedural requirement in this Circuit, however, is that a complete stenographic record of the hypnosis interview be maintained. *Id.* at 199 n. 12. *Cf. Rock*, 483 U.S. at 60–61, 107 S.Ct. 2704 (suggesting the following procedural safeguards to reduce the inaccuracies that hypnosis induces: that hypnosis be performed by a psychologist or psychiatrist; that such person have special training and be independent of the investigation; that the hypnosis occur in a neutral setting; and that no one be present except the subject and the hypnotist).[9] Thus, if the hypnosis interview has been properly recorded and maintained, and the foundation of post-hypnotic testimony remains in question, it is the defendant's burden to challenge the adequacy of the foundation. *See Adams*, 581 F.2d at 199.

Here, defense counsel made a strategic choice to eliminate all references to King and Crooks' hypnosis sessions, thereby preventing her from challenging the foundation of the hypnosis sessions themselves. She did, however, challenge the reliability, or credibility, of King's testimony during her cross-examination. Defense counsel was therefore able to impeach King's testimony without reference to the hypnosis session.

The fact that defense counsel did not mount the type of attack on post-hypnotic testimony that Mancuso would have liked did not render the trial "so 'arbitrary and

---

9. At the time of Mancuso's trial, post-hypnotic testimony was admissible in California and was not subject to clear procedural safeguards. *See People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 723 P.2d 1354 (1982);

*Aguilar v. Alexander*, 125 F.3d 815, 817 (9th Cir.1997) (discussing admissibility of post-hypnotic testimony in California prior to 1985).

fundamentally unfair' that it violated federal due process." *Pennywell*, 705 F.2d at 357 (quoting *Powell*, 679 F.2d at 166). We therefore affirm the district court's denial of this claim.

## VII

■■ Mancuso contends the prosecution committed misconduct in violation of Mancuso's due process rights by knowingly using false testimony based on post-hypnotic memories that were tainted by police coaching.

■■ Prosecutorial misconduct violates a defendant's due process rights when it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir.1995). "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson*, 74 F.3d at 1576(quoting *Jeffries v. Blodgett*, 5 F.3d at 1191).

■■ A prosecutor, however, has a constitutional duty to correct evidence he or she knows is false, even if it was not intentionally submitted. *See Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967). Similarly, "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction ... merely because the false testimony goes only to the credibility of the witness." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Here, Mancuso contends the prosecutor violated the Due Process clause when he knowingly presented "coached testimony" that "went directly to the credibility of the state's star witness." Mancuso relies principally on *Napue* in support of his contention.

There is no evidence in this case that the prosecutor presented false testimony. Because the parties agreed to exclude evidence of the hypnosis sessions, and the post-hypnotic testimony was properly admitted, it was defense counsel's burden, not the State's, to attack the credibility of the State's witnesses. As stated in Section IV, defense counsel made a strategic choice not to question the foundation of King's testimony and, instead, illuminated the discrepancies in King's pre- and post-hypnotic testimony and the officers' "coaching," on cross-examination.

Although Mancuso contends that cross-examination "cannot expose the manipulation of hypnotic suggestibility if it ignores the fact of hypnosis," this contention is contrary to the Supreme Court's ruling in *Rock*. As stated above, *Rock* held that "[c]ross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies." 483 U.S. at 61, 107 S.Ct. 2704.

We hold that the prosecutor's conduct did not rise to the level of a due process violation, and affirm the district court's denial of this claim.

## VIII

■■ Mancuso asserts that the cumulative effect of errors in this case prejudiced his right to a fair trial and warrants a reversal. Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996). Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation. *See Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999). We therefore hold there is no cumulative error and affirm the district court's denial of this claim.

## IX

Mancuso was entitled to a fair trial, not a perfect one. *See Lutwak v. United States,* 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). We think he received it based on the extensive record adduced in the California courts. He has not established a valid claim for federal habeas relief.

REVERSED, in Part, and AFFIRMED in Part.