# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### SEPTEMBER 17, 2002 Session

## CAVALIER METAL CORPORATION v. JOHNSON METAL CONTROLS

**Direct Appeal from the Circuit Court for Henderson County**
**No. 97013      C. Creed McGinley, Judge**

---

**No. W2001-01057-COA-R3-CV - Filed May 28, 2003**

---

Cavalier Metal Corporation sued Johnson Controls, Inc. for a breach of contract. A jury awarded Cavalier $2,029,294.00 in damages. At its motion for new trial, Johnson Controls, Inc. presented two juror affidavits alleging that another juror who had worked at Johnson Controls, Inc. imparted to the jury her knowledge of the very facts and issues at dispute in the trial. JCI had challenged this juror for cause during voir dire, but its motion had been denied. The trial court held the affidavits inadmissable under Tennessee Rule of Evidence 606(b). For the following reasons, we reverse and remand for a new trial.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Paul A. Alexis, Thor Y. Urness, Nashville, TN, for Appellant

Vicki H. Hoover, Paris, TN, for Appellee

## OPINION

### Facts and Procedural History

This is a breach of contract dispute. Johnson Controls, Inc. (JCI) entered into a contractual relationship with Cavalier Metal Corporation (Cavalier) for the plating and finishing of metal parts. The parts were returned to JCI for assembly into components that were sold to automobile manufacturers. The parties first entered into a contract in January of 1990, followed by a November 1990 agreement and a March 1993 contract. The parties ended their relationship in December of 1994 when Cavalier stopped work and went out of business. Cavalier subsequently sued JCI alleging various breaches of the parties' contract. JCI claimed that only the 1993 contract was put into

dispute, while Cavalier claimed that JCI breached both the November 1990 contract and the 1993 contract. The trial court instructed the parties that the case would include any breaches of contract after May 1990.

The November 1990 contract provided that Cavalier would perform all of JCI's Lexington, Tennessee plant's requirements for plating and metal finishing. The 1993 agreement likewise provided that Cavalier was to perform all of the plating required by JCI's Lexington, Tennessee plant. Cavalier also had an exclusive right to do any other plating and metal finishing required by the Lexington plant if the parties could agree on the price. No fixed amount or quantity of parts was specified. Cavalier had a right to request an annual increase to recover any increases in its cost. The contract replaced the previous contract and had an integration clause requiring any modifications to be made in writing.

Cavalier claimed that JCI breached the November 1990 and the 1993 contracts by sending 2.3 million dollars worth of plating business to DeWayne's of Lexington from 1990 through March of 1993. Cavalier also claimed that JCI began making modifications to the way in which the two companies did business. JCI began to reject a substantial number of parts for quality reasons. JCI later redefined the way in which parts were classified as defective, changing from a method where individual parts were judged defective on the assembly line to a method where a sample was taken from a container and if defective parts where found, the entire container was rejected. Cavalier claimed that these changes and other demands substantially increased its costs and that JCI refused Cavalier's requests to recoup these costs. The increased costs eventually forced Cavalier to cancel the contract, and, because JCI was Cavalier's only customer, to go out of business. Cavalier blamed the change in the relationship on its inquiry into whether the parts should have been put through a costly process called "hydrogen embrittlement" which would relieve the stress on the metal caused by the plating process making the parts less likely to fail. JCI defended its actions saying that Cavalier's performance under the contract was unacceptable as to quality, dependability, and timeliness.

After a lengthy trial, a jury found that JCI had breached the contract and awarded Cavalier $2,029,294.00 in damages. At a hearing on its motion for a new trial, JCI raised the issue of jury misconduct involving juror Terri Ricketts ("Juror Ricketts" or "Ms. Ricketts"). Ms. Ricketts was an employee of JCI during the time involved in the dispute. JCI had fired Ms. Ricketts for absenteeism. (Id.) Ms. Ricketts was placed on the jury apparently after JCI had exhausted its preemptory challenges. JCI challenged Ms. Ricketts for cause but the motion was denied. JCI then requested that Juror Ricketts be questioned outside the presence of the other jurors, but that request was also denied. JCI provided affidavits of two jurors who say that during deliberations, Ms. Ricketts informed them during a "smoking break" that she worked for JCI during the time period involved in the suit. Ms. Ricketts told the other jurors that she saw parts coming in from Cavalier to JCI and that they were of no worse quality than parts from other suppliers. She also told the other jurors that she knew that JCI had breached the contract first by sending parts out to other companies for plating. JCI's motion for a new trial was denied. JCI timely filed an appeal to this Court and presents the following issues for our review:

I. Whether the trial court erred by failing to grant a new trial where a juror who worked for the appellant during the period in question presented extraneous prejudicial information regarding her observations of the facts at issue during the jury's deliberations, the appellant's challenge for cause of such juror being denied.

II. Whether the trial court erred by providing supplemental instructions to the jury in response to questions from the jury which were not disclosed to the parties until the jury rendered its verdict and where one of the instructions was substantively erroneous.

III. Whether the trial court erred by permitting the plaintiff to seek damages not directly related to the parties' 1993 contract, by permitting the plaintiff to claim damages for the value of the plaintiff's business (or lost share or enterprise value) where lost profits was the proper measure of damages, by failing to perform its judicial task of interpreting the parties' 1993 contract, by permitting the plaintiff to seek "lost profits" that were not identified to any specific alleged breach and which were duplicative of other claims, and by failing to use a special verdict form submitted by the appellant which would have prevented the jury's award of such improper damages.

IV. Whether the trial court erred by admitting highly prejudicial and irrelevant evidence regarding "hydrogen embrittlement," including expert testimony which did not meet the standards for admissibility set forth in *McDaniel v. CSX Transportation*, where the plaintiff admitted that it had suffered no damages related to hydrogen embrittlement and the trial court ultimately recognized that hydrogen embrittlement was "not relevant" to this breach of contract case.

V. Whether the trial court abused its discretion by awarding the plaintiff prejudgment interest in the amount of $912,356.77, where, inter alia, the plaintiff omitted a claim for prejudgment interest from its complaint and the plaintiff was dilatory in pursuing this action.

**Law and Analysis**

**Juror Misconduct**

JCI presented two juror affidavits at the hearing on its motion for new trial. In regard to Juror Ricketts, Juror Diane Grissom stated the following:

One of the jurors, Ms. Ricketts, told us during our deliberations that she worked for Johnson Controls during that time period, referring to the events the trial was about. She also said she saw the parts going to and coming from Cavalier and that she knew what condition everything was in at Johnson Controls and that Johnson Controls was in violation of the contract first. Ms. Rickets had mentioned this information to me during a smoking break on the second day of our deliberations. I asked her to tell the rest of the jury about this information during our deliberations shortly after this break was over and we were back in deliberations, which she did. Ms. Ricketts also told

me during the smoking break that she knew - because she worked at Johnson Controls - that Johnson Controls was sending parts to platers other than Cavalier.

Juror Patsie Ann Schantz, in her affidavit, gave a similar account:

> One of the jurors, Ms. Ricketts, said to me and one or two other jurors during a smoking break that she had worked at Johnson Controls in a position where she saw incoming parts from Cavalier and others during that time, referring to the events the trial was about, and that Cavalier's quality was really no worse than anyone else's quality. Later during deliberations someone asked Ms. Ricketts if she had worked at Johnson Controls, when she worked there and how she viewed Cavalier's quality. Ms. Ricketts said in response that yes, she had worked at Johnson Controls, that she had worked there during the time period covered in the lawsuit, and repeated that she thought Cavalier's quality was no worse than anyone else's quality.

Both jurors stated in their affidavits that they were influenced by Juror Ricketts' information and felt that other jurors were as well.

It is unclear from the record exactly what the trial judge ruled on the admissibility of the above portions of the juror's affidavits. The judge at one point stated from the bench that "the affidavits, by far and away the majority if not all of the that material, is inadmissible under that rule [Rule 606(b)] because there are clearly statements in that rule that – such as the jury was at a certain point. Matters such as this are absolutely inadmissible." The trial judge stated he had subpoenaed the jury foreman on his own motion and then called the foreman of the jury to the stand where the following exchange took place:

> The Court: I've asked you to join us by means of subpoena. This will not be an interrogation. I will be addressing you, and my questions will be quite limited as to whether or not the jury followed their oath that I gave them, that they were to try this case and base – and render a fair and impartial verdict based upon the evidence presented and the law. And as a result of that, I'm not going into a whole lot of auxiliary matters because I think they're inadmissible and they're improper, and it's an improper invasion upon the province of that jury and their internal discussions. Are you following me?
> Mr. Franklin: Yes, sir.
> The Court: My first question to you, sir, is: In this particular case, the verdict that was returned, Cavalier Metals vs. Johnson Controls Corporation, was that verdict, in fact, based upon the evidence that was presented during the case?
> Mr. Franklin: Yes, sir.
> The Court: Was it also based upon the law that was presented to the jury that was both read to you and a written copy went to the jury room?

-4-

Mr. Franklin: Yes, sir.

The Court: Were there any outside influences that affected the jury's decision in this case?

Mr. Franklin: No.

The Court: And is it your testimony today under oath that that verdict was based upon the evidence and the law that was presented in this case and no outside prejudicial information?

Mr. Franklin: Yes, sir.

The Court: Thank you very much. You can step down and you may be excused.


The trial court, in a later written order denying the motion for new trial, found that the verdict was based on the evidence and law presented at the trial and was not based on a quotient or gambling verdict.

When a party alleges jury misconduct requiring a new trial, it must have admissible evidence to support its allegation. *Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 741 (Tenn. Ct. App. 1990). The admissibility of juror affidavits such as the ones presented in this case is governed by Tennessee Rue of Evidence 606(b). *See id.* at n.2. This rule states:

> (b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, *except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion;* nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

(emphasis added).

The emphasized portion of the above quoted rule delineates the three circumstances in which evidence from a juror may be admitted to impeach a verdict, namely when there has been "(1) extraneous prejudicial information, (2) outside influence, or (3) antecedent agreements to be bound by a quotient or majority result." *Caldararo*, 794 S.W.2d at 742. By limiting inquiry to these areas, the rule not only "precludes inquiries into the jury's deliberative process," it also "ensures that jurors will not be guarded in their deliberations for fear of later scrutiny by others" and prevents jurors with minority views from later recanting their vote. *Id.* Tennessee courts have furthered these policies by drawing a "distinction between extrinsic and intrinsic influence" on the jury. *Id.* Extrinsic influences such as "exposure to news items[,] . . . consideration of facts not admitted in evidence[,] . . . and communications with non-jurors about the case" are

influences that, if found prejudicial, warrant a new trial. *Id.* (citations omitted). Intrinsic influences such as "discussion among jurors[,] . . . intimidation or harassment of one juror by another[,] . . a juror's personal experiences not directly related to the litigation, and . . . a juror's subjective thoughts, fears, and emotions" are not reason enough for a new trial. *Id.* (citations omitted). The *Caldararo* court continued:

> Jurors must render their verdict based on the evidence introduced at trial.
> . . . .
> It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Thus, it would be unreasonable, and perhaps unwise, to expect juries to be completely sterilized and free of any external influences. The jurors various attitudes, philosophies, experiences and backgrounds are the "very human elements that constitute one of the strengths of the jury system.
> Accordingly, jurors are not required to be completely ignorant about a case, and a verdict will not be overturned because of jurors' generalized knowledge of the parties or of some other aspect of the case. A juror's personal experiences unrelated to the litigation are not external information. *However, a juror's personal experiences directly relating to the parties or events directly in the litigation may be.*

*Id.* at 743-44 (citations omitted) (emphasis added).


In the case *sub judice*, we are presented with a juror with personal knowledge about the specific facts at issue in the trial. We must first decide whether the information was "extraneous" information for the purposes of Rule 606(b). The information that Juror Ricketts imparted to the other jurors does not neatly fit into the categories outlined by the *Caldararo* court. It is not an "extrinsic influence" such as a newspaper article or third-party contact with a juror. However, under facts different from the ones at hand, it might be considered as "facts not admitted in evidence," but as Cavalier argues, the information imparted to the jury by Juror Ricketts outside of the courtroom was presented in the courtroom by witnesses on the stand, as was contradictory information. The information given to the jury by Juror Ricketts also does not fit neatly into the category of "intrinsic influence" because, although it was a "discussion among jurors," it was directly related to the litigation. It also was not "intimidation or harrassment" or a "juror's subjective thoughts, fears, or emotions."

As stated above, the *Caldararo* court acknowledged that "a juror's personal experiences directly relating to the parties or events in the litigation may be" external or extraneous information. As one commentator stated regarding this portion of the *Caldararo* opinion, "the use of [juror provided] information could be inquired into if the data related to the specific facts of the case." Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE § 6.06[3] (4th ed. 2000). This is in accord with other jurisdictions who have considered this narrow issue. The case cited by the *Caldararo* court for the above proposition states "if a juror's past experiences were directly related to the litigation, as the

affidavits filed in the district court claimed, the discussion of those experiences would constitute extraneous information that could be used to impeach a jury's verdict." *Hard v. Burlington Northern Railroad Company*, 870 F.2d 1454, 1462 (9th Cir. 1989). The Sixth Circuit has stated "an extraneous influence on a juror is one derived from specific knowledge about or a relationship with either the parties or their witnesses. This knowledge is such that it taints the deliberations with information not subject to a trial's procedural safeguards." *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998). Most recently, the Ninth Circuit has held that "[a] juror's personal knowledge of specific information concerning the defendant or the defendant's alleged crime constitutes impermissible extrinsic evidence." *See Mancuso v. Olivarez*, 292 F.3d 939, 950 (9th Cir. 2002). The Alaska Supreme Court[1], after a review of the polices underlying Rule 606(b) and case law from other jurisdictions stated "[w]e agree with the majority view that pre-existing knowledge about the case or the defendant can constitute extraneous prejudicial information under Rule 606(b)." *Titus*, 963 P.2d at 262. The Tennessee Court of Criminal Appeals has held that "[e]xtraneous information includes a juror's personal knowledge of an accused's prior criminal record or arrest." *State v. Dunlap*, No. 02C01-9801-CC-00009, 1998 Tenn. Crim. App. LEXIS 985, at *5-6 (Tenn. Ct. Crim. App. Sept. 21, 1998) ; *But see State v. Crenshaw*, 64 S.W.3d 374, 393-94 (holding that, absent evidence to the contrary, defendant having accepted jurors with pre-existing knowledge of prior record and reputation at voir dire could not claim such information was extraneous[2]). We think that the reasoning and policies underlying these decisions are sound. Where, as here, a juror has first-hand knowledge of the facts and issues in dispute, we find that the injection of this knowledge into jury deliberations constitutes extraneous information for the purposes of Rule 606(b).

When a juror brings personal knowledge of the very facts at issue in the trial into the jury's deliberations, the problems that arise are obvious. The juror is in essence becoming an unsworn witness whose testimony is not subject to the safeguards provided by the adversarial system to assess its trustworthiness. *See Olivarez*, 292 F.3d at 950 ("potential for prejudice is heightened when a juror interjects into the deliberations 'objective extrinsic facts' regarding the accused because that

---

[1] Alaska's Rule of Evidence 606(b) is substantially similar to Tennessee Rule of Evidence 606(b). Alaska's rule reads as follows:

(b) Inquiry Into Validity of Verdict or Indictment. -- Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

[2] We note that such is not the case here. JCI moved to strike Juror Ricketts for cause, and was denied. JCI apparently had no peremptory challenges left at this stage of jury selection. JCI also moved for further questioning of Juror Ricketts outside the presence of the other jurors, and was denied. We do not think it can be said that JCI accepted Juror Ricketts, and thus must distinguish the *Crenshaw* decision based on the facts before us.

juror becomes an unsworn witness not subject to either confrontation or cross examination."); *Titus*, 963 P.2d at 261 ("Concerns about the accuracy and fairness of verdicts are implicated when the jury considers evidence that has not been presented in open court and thus has not passed the test of adversarial challenge."). This idea is not new to Tennessee Jurisprudence.[3] This lack of testing through the adversarial process leaves the other jurors presented with the extraneous evidence to deal with the information on their own and as the Alaska Supreme Court stated:

> juror knowledge about the specific facts of the alleged crime itself is more likely than general knowledge to lead to inaccurate verdicts because it is unlikely to be tested by other jurors during deliberations. *See* Wright & Gold, *supra*, § 6075, at 452. Because not all jurors will have access to specific facts about the crime and the defendant's connection thereto, those who purport to have such information may be believed without debate, even if their information is inaccurate.

*Id.* at 263.

Having decided that the information presented by Juror Ricketts to the other jurors is extraneous information for the purposes of Rule 606(b), we must next decide whether such information was prejudicial and, if so, whether it had an influence on the jury. *See Patton v. Rose*, 892 S.W.2d 410, 414 (Tenn. Ct. App. 1994) (finding that while newspaper article about topic related to trial was "clearly" extraneous information, the information was not prejudicial to the plaintiff and that there was no evidence that it affected the jurors in their deliberations). We find the nature of the information provided by Juror Ricketts is prejudicial. There was testimony from the stand from both sides about the very same matters Juror Ricketts commented about, but we think that Juror Ricketts' comments had the effect of putting a thumb on the scale in favor of Cavalier. The likelihood that the other jurors would place great weight on the knowledge of one of their own is high. Furthermore, both of the affidavits submitted in this case state that those two jurors were influenced by the comments and that they felt the other jurors were as well. We find the information was both prejudicial and that it influenced the jury.

"Pursuant to Rule 606(b) a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention without doing violence to the importance of the inviolate nature of their deliberations because litigants are absolutely entitled to verdicts free of extraneous prejudicial information." *Terry v. Plateau Electric Cooperative*, 825 S.W.2d 418, 423 (Tenn. Ct. App. 1991). We are mindful of the "inviolate nature" of jury deliberations, but the particular facts of this case before us show a juror with pre-existing knowledge

---

[3] *See e.g.*, *Booby v. State*, 12 Tenn. 111 (Tenn. 1833). In *Booby*, a new trial was granted to a criminal defendant charged with receiving stolen property after two jurors presented affidavits stating that another juror had told them during deliberations that the defendant had previously stolen a hog. *Id.* at 113. The affidavits stated that this information influenced the jury's guilty verdict. *Id.* at 114. The Tennessee Supreme Court stated "[t]his verdict is too palpably vicious to require the citing authorities to prove that it ought not to stand. What the juror knew of the defendant ought to have been proposed and offered in court, and if admissible, there rendered, to be observed upon by the defendant's counsel." *Id.* at 115.

of the facts and issues at the heart of trial relating this knowledge to other jurors. This information that JCI violated the contract first, and that Cavalier's quality was no different than any of JCI's other suppliers is extraneous, prejudicial information. As stated above, JCI is absolutely entitled to a verdict free of such information, and, thus, we must remand for a new trial.

## Conclusion

For the reasons stated above, we reverse and remand this case for a new trial. All other issues are pretermitted. Costs are taxed to Cavalier Metal Corporation and its surety, for which execution may issue if necessary.

 

_____
ALAN E. HIGHERS, JUDGE