Terry Darnell WILLIAMS, Petitioner,

v.

D. RUNNELS, Warden, Respondent.

No. CV–01–3301–SVW (JWJ).

United States District Court,
C.D. California,
Western Division.

July 30, 2009.

1204

Michael Tanaka, Federal Public Defenders Office, Los Angeles, CA, for Petitioner.

David A. Voet, Stephanie A. Miyoshi, CAAG—Office of Attorney General of California, Los Angeles, CA, for Respondent.

ORDER ADOPTING THIRD SUPERSEDING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

STEPHEN V. WILSON, District Judge.

Pursuant to 28 U.S.C. Section 636(b)(1)(C), the Court has reviewed the instant First Amended Petition along with the attached Third Superseding Report and Recommendation of the United States Magistrate Judge, and has made a *de novo* determination of the Third Superseding Report and Recommendation.

IT IS ORDERED that Judgment be entered granting Petitioner a conditional writ of habeas corpus and discharging Petitioner from custody and all adverse consequences of his conviction in Los Angeles County Superior Court Case No. TA048776, unless Petitioner is brought to retrial within ninety (90) days of the date this Judgment becomes final, plus any additional delay authorized under State law.

IT IS FURTHER ORDERED that the Clerk shall serve forthwith a copy of this Order and the Judgment of this date on counsel for Petitioner and Respondent.

THIRD SUPERSEDING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JEFFREY W. JOHNSON, United States Magistrate Judge.

This Third Superseding Report and Recommendation is submitted to the Honorable Stephen V. Wilson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

The undersigned previously recommended, on August 11, 2003, that the District Court grant a conditional writ of habeas corpus to Petitioner based on his first claim for relief. On March 2, 2004, the District Court declined to adopt the recommendation and instead issued an order denying habeas relief. On January 5, 2006, the Ninth Circuit Court of Appeals vacated the order denying habeas relief and remanded to the court for further proceedings.

For the reasons discussed below, the undersigned continues to recommend that a conditional writ of habeas corpus be granted to Petitioner.

I.

**PROCEDURAL HISTORY**

On March 16, 1998, petitioner Terry Darnell Williams was convicted in Los Angeles County Superior Court of second degree robbery while armed with a firearm (Cal.Penal Code §§ 211, 12022(a)(1)) and was sentenced to thirty-four years to life in state prison. (Clerk's Transcript ("CT") 107, 139–40, 160–62). On February 7, 2000, the California Court of Appeal affirmed Petitioner's conviction. (Lodg-

ment No. 4). The California Supreme Court denied Petitioner's petition for review on April 19, 2000. (Lodgment No. 8). Petitioner also filed in the California Court of Appeal a petition for writ of habeas corpus which the court denied on February 7, 2000. (Lodgment Nos. 5, 6).

On April 11, 2001, Petitioner filed the Petition for Writ of Habeas Corpus by a Person in State Custody initiating the instant action. On April 18, 2001, the Magistrate Judge recommended that the Petition be dismissed as unexhausted. On May 8, 2001, Petitioner filed a properly exhausted First Amended Petition. Respondent filed an Answer to the First Amended Petition on October 9, 2001.

On August 12, 2002, the Magistrate Judge appointed counsel to represent Petitioner and ordered an evidentiary hearing to determine the facts underlying Petitioner's first ground for relief. Respondent moved to vacate the hearing. The Magistrate Judge denied Respondent's motion. Respondent renewed the motion and the Magistrate Judge granted it based on Respondent's assertion that no relevant evidence could be adduced at the hearing.

The Magistrate Judge reviewed the merits of the First Amended Petition and the evidence before the court and, based on Petitioner's first ground for relief, on August 11, 2003, recommended granting conditional habeas relief. The District Court disagreed with the Magistrate Judge's recommendation and denied relief in an order issued March 2, 2004. *Williams v. Runnels*, 312 F.Supp.2d 1266 (C.D.Cal.2004). The District Court also granted a certificate of appealability.

On January 5, 2006, the Ninth Circuit vacated the District Court's order and remanded to the court. *Williams v. Runnels*, 432 F.3d 1102 (9th Cir.2006). The Ninth Circuit instructed the court to consider the Supreme Court's intervening authority on the application of the equal protection clause to jury selection.

The matter was referred to this court on February 15, 2006. The Magistrate Judge again recommended granting Petitioner's habeas in a July 2006 Second Superseding Report and Recommendation. Respondent did not object to the Second Superseding Report and Recommendation. On September 13, 2006, the Magistrate Judge withdrew the Second Superseding Report and Recommendation in order to consider new authority from the Ninth Circuit Court of Appeal. Now, in this Third Superseding Report and Recommendation, the Magistrate Judge continues to recommend that Petitioner be granted relief.

## II.

## STANDARD OF REVIEW

The Anti–Terrorism and Effective Death Penalty Act ("AEDPA") provides in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. Under the AEDPA, a federal court shall presume that a determination of factual issues made by a state court is correct and Petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

■ In reviewing a habeas petition, the court will examine an explicated California Court of Appeal opinion under the AEDPA where the California Supreme Court opinion denies the same claims without discussion because "where there has been one reasoned state court judgment rejecting a federal claim, [federal habeas courts should presume that] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *see also Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

### III.

### GROUNDS FOR RELIEF

Petitioner presents two grounds for relief in his First Amended Petition:

(1) "The trial court violated appellant's state and federal constitutional rights to a fair trial when it denied his motion to dismiss the jury panel after the prosecutor improperly used peremptory challenges to eliminate African American members of the jury panel."

(2) "The trial court violated appellant's state and federal constitutional rights to a fair trial when it denied his motion for mistrial after the jurors witness[ed] an altercation involving a key defense witness outside the courtroom."

(First Amended Petition, at 5). Each claim is discussed below.

### IV.

### CLAIM ONE: *BATSON V. KENTUCKY*

■ Petitioner contends that the prosecutor used his peremptory challenges

to remove all but one African–American from the jury panel in violation of Petitioner's federal constitutional right to a fair trial. (First Amended Petition, at 5). This court is bound to construe liberally Petitioner's *pro se* pleading. *Brown v. Vasquez,* 952 F.2d 1164, 1166 n. 7 (9th Cir.1991); *Johnson v. Meltzer,* 134 F.3d 1393, 1397 (9th Cir.1998). As such, the court considers this claim to be the same claim of an equal protection violation Petitioner raised in state court.[1] (*See* Lodgment No. 7, at 8–13). On remand from the Ninth Circuit, this court continues to recommend granting relief on this claim.

■ A prosecutor violates a defendant's equal protection rights if he excludes members of the jury venire based on their race. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Williams,* 432 F.3d at 1105–06. The United States Supreme Court reiterated the standard for analyzing a claim of discrimination under *Batson,* which the court noted "should by now be familiar":

First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering plausible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California,* 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (internal quotations omitted); *Miller–El v. Dretke ("Miller–El II"),* 545 U.S. 231, 239,

---

1. To the extent Petitioner is claiming the state courts violated his rights under the California constitution, his claim fails. Federal habeas relief is not available to remedy alleged errors of state law. 28 U.S.C. § 2254; *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Any constitutional error in jury selection is structural and is not subject to harmless error review. *Windham v. Merkle,* 163 F.3d 1092, 1096 (9th Cir.1998); *Turner v. Marshall ("Turner II"),* 121 F.3d 1248, 1254 n. 3 (9th Cir.1997).

As noted by the Ninth Circuit, in Petitioner's case during voir dire the prosecutor used three of his first four challenges to remove three of the four African–American jurors (juror numbers 7013 and 8963 and juror Barnett) in the jury panel.[2] (Reporter's Transcript ("RT") 236–40); *Williams,* 432 F.3d at 1103–05. After the third African–American juror was removed, Petitioner's counsel made a *Wheeler* motion.[3] (RT 238). The trial court found that Petitioner had not made a prima facie showing of discrimination under *Wheeler* and denied the motion. (RT 239). When the prosecutor started to articulate a reason for removing at least one of the jurors, the trial judge stopped the prosecutor from doing so because the judge had found no prima facie case of discrimination. (RT 239–40). The trial judge also noted that if the prosecutor challenged another African–American juror, defense counsel could renew the *Wheeler* motion. (*Id.*).

Prior to using any peremptory challenges in the multi-defendant case, the prosecutor had accepted the jury six times. (RT 234–36). Juror number 7013 was seated in the jury box each of the six times the prosecutor accepted the jury and juror number 8963 was seated in the box four of these times. (*See id.*). The prosecutor never accepted a jury with juror Barnett. (RT 236–38). By the close of voir dire, the prosecutor had used only five peremptory challenges, and three of those had been exercised on the Black jurors at issue. (RT 234–41, 291–96).

The California Court of Appeal denied Petitioner's claim for the same reason advanced by the trial court: it found no prima facie case of discrimination. (Lodgment No. 4, at 6–8). The appellate court reviewed the voir dire transcript and stated its satisfaction that "reasonable grounds" existed for removing the jurors at issue such that Petitioner had not shown a "strong likelihood" of discrimination sufficient to make a prima facie case under *Wheeler.* (Lodgment No. 4, at 6–8.) Thus, the California Court of Appeal did not undertake either the second or third steps of the *Batson* analysis. The California Supreme Court issued a denial without explanation of this same equal protection claim. (Lodgment No. 8.)

### A. Prima Facie Case of Discrimination

■ As held by the Ninth Circuit, this court's review of Petitioner's *Batson* claim—even under the AEDPA—is de novo because the California courts applied an incorrect standard in analyzing the claim.[4] *Williams,* 432 F.3d at 1105; *accord Johnson,* 545 U.S. at 173, 125 S.Ct. 2410; *see also Paulino v. Castro,* 371 F.3d 1083, 1090 (9th Cir.2004); *Fernandez v. Roe,* 286 F.3d 1073, 1077 (9th Cir.2002).

■ The United States Supreme Court and the Ninth Circuit have consistently applied *Batson*'s prima facie standard:

---

**2.** As explained below, the court will presume that the fourth African–American was actually seated as a trial juror. The racial composition of the jury venire is discussed in detail below.

**3.** *People v. Wheeler,* 22 Cal.3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978) (California state case paralleling the anti-discrimination objectives of *Batson* ).

**4.** The California Court of Appeal applied *Wheeler*'s "strong likelihood" test in denying Petitioner's claim. (*See* Lodgment No. 4, at 6 ("Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association rather than because of any specific bias.") (emphasis in original).)

To establish [a prima facie] case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove [members of a cognizable group] from the venire.... Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Johnson,* 545 U.S. at 169, 125 S.Ct. 2410 (quoting *Batson,* 476 U.S. at 96, 106 S.Ct. 1712). As the Supreme Court held in *Johnson,* "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" *Johnson,* 545 U.S. at 169, 125 S.Ct. 2410 (quoting *Batson,* 476 U.S. at 94, 106 S.Ct. 1712); *Miller–El II,* 545 U.S. at 239, 125 S.Ct. 2317.

■ Here, the Ninth Circuit found that the order denying the petition "failed to appreciate the import of [Petitioner's]

showing of statistical disparity" in the prosecutor's use of peremptory challenges. *Williams,* 432 F.3d at 1103–07; *see also Paulino,* 371 F.3d at 1091 ("[A] defendant can make a prima facie showing based on statistical disparities alone."). According to the Ninth Circuit, Petitioner demonstrated a statistical disparity in the use of peremptory challenges when he showed that the prosecutor removed three out of the four African–Americans and used three of his first four challenges to remove the African–Americans.[5] *Williams,* 432 F.3d at 1107. This is the same conclusion reached by this court in its August 2003 recommendation:

At the time of Petitioner's *Wheeler* motion, the prosecutor had used four peremptory challenges. (RT 236–38.) Three of these challenges were used to remove African–American jurors. (*Id.*) By the close of voir dire, the prosecutor had used only five challenges. (RT 234–41, 291–96.) In making the *Wheeler* motion, Petitioner's counsel noted without objection that only one African–American remained in the jury panel. (RT 239; First Amended Petition, at 5.) Thus, defense counsel alerted the trial court to the raw number of peremptory challenges as well as the percentage of strikes used against African–American jurors and the percentage of African-American jurors removed by the prosecutor.[6]

---

**5.** The District Court took issue with this court's definition of the jury pool and racial make-up. *Williams,* 312 F.Supp.2d 1266. However, the Ninth Circuit stated that "it appears that only four of the first forty-nine potential jurors were African–American." *Williams,* 432 F.3d at 1107.

**6.** Respondent contends that defense counsel did not create an record in making the *Wheeler* motion and therefore that Petitioner is not now entitled to habeas relief on this claim.

(Answer, at 10; Objections to Report and Recommendation.) While a defendant does have a duty to alert the trial court to the circumstances raising an inference of discrimination, *Johnson v. Campbell,* 92 F.3d 951, 953 (9th Cir.1996), Petitioner's trial counsel did so here. At trial, counsel noted that the prosecutor had exercised only four strikes and that three were used to remove Black jurors and that only one Black juror

Respondent argues that this court has made an unwarranted assumption that only four out of 49 veniremembers were African–American.[7] (*See* Objections to Report and Recommendation.) Respondent argues that when counsel stated that only one African–American was left "sitting on the panel," he was referring only to the jurors remaining in the 12 person jury box, not to the entire venire. (*Id.*) Therefore, Respondent argues, the court has no information regarding the race of 33 of the 49 jurors.

In his First Amended Petition, signed under penalty of perjury, Petitioner alleges that once the prosecutor removed the three African–American jurors at issue, only one African–American remained to be selected. (First Amended Petition, at 5, 7.) When the *Wheeler* motion was denied, there were 24 potential jurors remaining to be selected (22 who had not yet been questioned and two who had been questioned) beyond those 12 already seated in the jury box. (*See* RT 232–41.) Petitioner's allegation is, therefore, that only one remaining potential juror out of 36 was African–American, and correspondingly, that only four out of 49 potential jurors were African–American.

Although Respondent generally denied "each and every allegation of the Petition" (*see* Answer, at 2), he has offered no facts to contest this allegation specifically. In fact, the record supports Petitioner's allegation; once the *Wheeler* motion was made, defense counsel noted,

without argument, that only one African–American was "sitting on the panel now." (RT 238–39.) Counsel's statement, while it could be interpreted in a different manner, also can be read to support Petitioner's allegation that only one African–American was left to be chosen for the jury. No contradictory evidence appears in the record.

Respondent argues that the court can not know whether any of the jurors beyond the 12 actually seated in the jury box were African–American without relying on "conjecture, not the record." (*See* Objections to Report and Recommendation, at 1.) In fact, the court ordered an evidentiary hearing in part to determine the racial composition of the venire, but Respondent moved to vacate that hearing two times. Counsel for Respondent stated that he "made inquiries" with the trial attorneys who were unable to offer information about the racial make-up of the jury and that, in his review of the District Attorney's file, he "did not discover any evidence regarding racial composition ... [and] [u]nder these circumstances, [he was] unable to provide any new evidence regarding racial composition." (Motion to Vacate Order for Evidentiary Hearing, at 6, Exh. C, at 127–28; *see also* Renewed Motion to Vacate Order for Evidentiary Hearing.)

On the other hand, Petitioner alleged under penalty of perjury that only one African–American remained to be selected after the prosecutor removed the oth-

---

was left on the jury panel. Specifically, counsel stated:

> At this time, I would make a motion under *Wheeler*, Your Honor. People have exercised four peremptories after passing, I believe, five or six times. Three of the four peremptories that have been exercised, the last three have all been African Americans. The first one was a woman, last two have been men.... Ms. Boyd [juror number 7013] was originally one—the other ones getting on, they have all

been excused. We only have one African American sitting on the panel now.

(RT 238–39.) Thus, in making this motion, counsel alerted the court to the high rate of strikes used to remove Black jurors and the high rate of Black potential jurors removed.

7. Originally there were 55 potential jurors, but the trial court removed six jurors for cause or because of hardship. (*See* RT 232.)

er African–American potential jurors and the record supports this allegation. In denying Respondent's original motion to vacate the hearing, the court pointed out to Respondent that without a hearing, the court would consider Petitioner's evidence, already in the record, "without benefit of any counter-evidence from the State." Nevertheless, Respondent again moved to vacate the hearing.

This court has made no assumption about the racial make-up of the jury venire—it has relied on Petitioner's allegation, supported by the trial record and made under penalty of perjury, that only one African–American remained to be chosen for the jury after the prosecutor exercised his peremptory challenges.[8] ... Petitioner placed evidence before this court which supports his claim while Respondent chose to present no evidence and to avoid a hearing, in the course of which he, obviously, at the *very* least, could have questioned Petitioner under oath.

\* \* \*

■ In Petitioner's case, the statistics are striking. The prosecutor removed 75% of the Black jurors, compared to 57% in *Fernandez* and 56% in *Turner v. Marshall ("Turner I"),* 63 F.3d 807, 812 (9th Cir.1995), *overruled on other grounds by Tolbert v. Page,* 182 F.3d 677 (9th Cir.1999) (en banc). Moreover, in Petitioner's case, African–Americans constituted as little as 8% of the venire (4 out of 49), yet the prosecutor used 60% of his total strikes to remove Black jurors, or, at the time of Petitioner's *Wheeler* motion, 75% of his strikes to remove Black jurors.[9] *See Fernandez,* 286 F.3d at 1078 (analyzing percentages at close of voir dire and at time *Wheeler* motion made; prosecutor used 21% of strikes against Hispanics compared to overall percentage of 12% Hispanic jurors); *Turner I,* 63 F.3d at 813 (assuming 30% of venire African–American but 56% of prosecutor's strikes used against African–Americans).

---

**8.** In his Objections to the Report and Recommendation, Respondent cites *Williams v. Woodford,* 306 F.3d 665, 682 (9th Cir.2002), as support for his position that habeas relief is not warranted because the racial composition of the jury venire is unknown. Respondent paraphrases *Williams v. Woodford*'s holding as follows: "a prima facie case not established when the record did not show how many African–Americans were on the venire." (Objections to Report and Recommendation, at 7.) In fact, the relevant passage in *Williams v. Woodford* supports the court's reliance on Petitioner's factual allegation in conjunction with the trial record. Specifically, the Ninth Circuit stated: "However, *because Williams failed to allege,* and the record does not disclose, facts like how many African–Americans (apparently men, if any) sat on the jury, how many African–Americans were in the venire, and how large the venire was, it is impossible to say whether any statistical disparity existed that might support an inference of discrimination." *Williams v. Woodford,* 306 F.3d at 682 (emphasis added).

**9.** Although five jurors may be a relatively small sample from which to draw conclusions, the Ninth Circuit in *Fernandez* and *Turner I* considered groups of jurors not significantly larger than that under consideration here. The court in *Wade* noted the problem of a small sample size where only one of three strikes was used against a Black juror. *Wade,* 202 F.3d at 1198; *cf. United States v. Vaccaro,* 816 F.2d 443, 457 (9th Cir.1987) (striking only two Black jurors does not by itself raise an inference of discrimination), *overruled on other grounds by Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *but cf. Turner I,* 63 F.3d at 813 n. 3 (distinguishing *Vaccaro* and finding that while two jurors may not be sufficiently large sample, five jurors is sufficient); *see also Fernandez,* 286 F.3d at 1078–79 (where the court noted the problem of a small sample size only with respect to its examination of a group of two jurors but even there found a prima facie case of discrimination when all relevant circumstances were considered).

... These are not raw numbers, these are numbers showing a pattern of strikes used almost exclusively to remove Black jurors. This prosecutor struck very few jurors; those he did choose to remove, however, were, in overwhelming disproportion, African–American; in fact, he removed all but one of the African–Americans in the jury panel. This raised an inference of discrimination. *Fernandez*, 286 F.3d at 1078; *Turner I*, 63 F.3d at 812–13; *see also Jones v. Ryan*, 987 F.2d 960, 971 (3d Cir.1993) (prima facie case found where prosecutor removed three of four Black jurors and used three of his four peremptory challenges to do so); *United States v. Alvarado*, 923 F.2d 253, 255–56 (2d Cir.1991) (prima facie case found where prosecutor struck four of seven minority jurors because "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under *Batson*.").

(Superseding Report and Recommendation, 10–18) (footnotes in original, some footnotes omitted.) This court continues to find a prima facie case based on this same analysis. *See also Paulino*, 371 F.3d at 1091 (where prosecutor used five of six peremptory challenges to remove five of six African–American jurors, prima face case of discrimination established even where court is able to review only a "mere sliver" of the jury selection record provided by the state).

The question posed by the Ninth Circuit is whether the inference of discrimination raised by this statistical disparity had been dispelled by "other relevant circumstances." *Williams*, 432 F.3d at 1108. The Ninth Circuit concluded here that the existing record "failed to disclose a refutation of the inference of bias raised by the statistical disparity." *Id.*, 432 F.3d at 1109. Further, according to the Ninth Circuit, Petitioner was entitled to an evidentiary hearing on his claim, as this court

previously found. *See id.*, 432 F.3d at 1110. In fact, the Ninth Circuit held that "it appears that if there are other relevant circumstances that might dispel the inference [of discrimination], *it was the state's responsibility to create a record that dispels the inference.*" *Id.* (emphasis added).

 Previously, this court ordered an evidentiary hearing, and vacated it only at Respondent's repeated request and then only because Respondent represented that no further evidence was available regarding the racial make-up of the potential jury or regarding the prosecutor's actual reasons for his challenges. (*See* Motion to Vacate Evidentiary Hearing, at 11–12.) Respondent did not suggest that any other relevant evidence might be adduced at a hearing. Given these circumstances, this court need not offer Respondent what would now be a third opportunity for an evidentiary hearing. *See also Williams*, 432 F.3d at 1110.

 The court now is left with its original finding and recommendation that, on the existing record, Petitioner raised an inference of discrimination. *See also id.*, 432 F.3d at 1109 (finding same). The Ninth Circuit explained that none of the following facts, already known to this court, dispelled the inference of discrimination: the prosecutor's acceptance of the jury with African–American members prior to exercising his challenges; the fact that the prosecutor did not use any further challenges against African–Americans after Petitioner's objection; and the fact that there may have been potential non-race based reasons for striking the jurors in question. *See id.*, 432 F.3d at 1109–10. On the other hand, the timing of the prosecutor's challenges strengthens the inference: African–Americans were removed with three of the prosecutor's first four challenges. *See id.*, 432 F.3d at 1108 n. 9 (noting that the timing of the prosecutor's

strikes could affect inference of discrimination). Thus, at the time of Petitioner's objection, 75% of the prosecutor's challenges had been used to remove African–American jurors. There is no suggestion that the proportion of African–Americans available for selection was anywhere near this high.

Moreover, if the court is to compare the African–American jurors removed by the prosecutor with jurors not removed by the prosecutor, the inference of discrimination is even stronger. *See Boyd v. Newland,* 467 F.3d 1139, 1149–50 (9th Cir.2006) (holding that reviewing courts should conduct comparative juror analysis at *Batson* steps one and three), *cert. denied,* 550 U.S. 933, 127 S.Ct. 2249, 167 L.Ed.2d 1089 (2007). In denying Petitioner's claim, the California Court of Appeal relied on what it considered to be "obvious" reasons why the prosecutor might have wanted to remove the jurors at issue. (Lodgment No. 4, at 6–8.) Review of these potential reasons for striking the three jurors actually bolsters Petitioner's *Batson* claim.

Specifically, the record demonstrates that the prosecutor failed to remove non-Black jurors who shared with excused Black jurors the specific characteristics described as the purportedly "obvious" reasons for the strikes. *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317; *see also Kesser v. Cambra,* 465 F.3d 351, 360–68 (9th Cir.2006) (reviewing voir dire transcript to compare jurors' characteristics). Each of the three challenged African–American jurors is considered below:

*Juror No. 7013:* The California Court of Appeal found, and Respondent has argued here, that the prosecutor clearly would have wanted to remove juror number 7013 because her son had been convicted of grand theft and incarcerated (Petitioner was convicted of second degree robbery). (Lodgment No. 4, at 6–7; Answer, at 11; RT 190–91.) In fact, the record suggests that the prosecutor may have been about to offer this reason for removing the juror when the trial judge cut him off.[10] (RT 240.) Having had a family member charged with a crime similar to that with which the defendant is charged could constitute a legitimate reason why a prosecutor would want to remove a juror; however, in this case, this factor does not illustrate a non-discriminatory basis for the prosecutor's peremptory strike because the prosecutor did not also remove juror number 3236, whose son had been arrested for robbery and had a drug problem. (*See* RT 191–92.) Since the prosecutor did not remove this other juror, whose child's alleged crimes matched Petitioner's even more closely, this so-called "obvious" reason for removing juror number 7013 does not dispel an inference that the prosecutor acted with racial motivation.[11, 12]

---

10. When the trial court found that no prima facie case was made, the following colloquy occurred:
 [Prosecutor]: So the record is clear on this issue, Ms. Joyce Boyd, juror number one, indicated she had a son who—
 The Court: You don't need to give an explanation because I'm not finding a prima facie.
 (RT 240).

11. The prosecutor also removed another juror whose mother-in-law was jailed on drug charges and whose brother-in-law was jailed on murder charges and who believed in the innocence of his brother-in-law. (RT 266–68, 291.) No *Wheeler* motion was made with respect to this juror.

12. Although there is a distinction between the robbery arrest of juror number 3236's son and the conviction of juror number 7013's son, that distinction is less important given the fact that juror number 3236's son also had a drug problem and the fact that juror number 7013 felt that her son had been treated fairly by authorities.

Moreover, when the trial judge asked jurors whether they or a family member had been convicted of a crime, he also questioned how they felt the system had treated the individual convicted. Juror number 7013, the Black juror removed by the prosecutor, stated that she believed the system had treated her son fairly. (RT 191.) In contrast, two other jurors not removed by the prosecutor asserted that the justice system had not treated them fairly in their own respective arrests. Juror number 3134 felt that he had been "set up" when he was arrested for DUI and juror number 3601 indicated that his arrest for possessing weapons was unjustified.[13] (RT 192–95.)

*Juror No. 8963:* The California Court of Appeal found, and Respondent has suggested to this court, that the prosecution clearly would have wanted to remove juror number 8963 because she was unemployed, lived a solitary life (in that she was single and formerly a truck driver), and had no prior jury experience. (Lodgment No. 4, at 7; Answer, at 11–12; RT 158–59.) However, by comparison, juror number 3601 also was unemployed, was separated from his wife, had no jury experience, and had been, unfairly he thought, arrested for a crime; yet juror number 3601 was not removed by the prosecutor. (*See* RT 171–72, 194–95.) Additionally, juror number 2914 was a truck driver with no jury expe-

rience; he was not removed by the prosecutor.[14] (RT 146–47.)

Furthermore, the California Court of Appeal's statement that "at the time the prosecutor exercised his peremptory challenge to excuse prospective juror [number 8963], the vast number of individuals on the panel had prior jury experience" (*See* Lodgment No. 4, at 7), is not supported by the record. When juror number 8963 was removed, 14 of 33 prospective jurors who had already been questioned, that is, 42%, had no jury experience; correspondingly, 19 of 33, 58%, did have experience.[15] (*See* RT 142–76.) While the California Court of Appeal was correct that more jurors had jury experience than did not, it was hardly a "vast number" of the 33 who had jury experience. More important and revealing, the prosecutor used only one other peremptory challenge to remove a juror with no jury experience. (*See* RT 244, 291.)

*Juror Barnett:* The California Court of Appeal found, and Respondent has argued here, that juror Barnett undoubtedly was dismissed because of his answer to a question from counsel for Petitioner's co-defendant. (Lodgment No. 4, at 7–8; Answer, at 12.) On the basis of juror Barnett's previous answers that he had many friends and family in law enforcement, co-defen-

---

**13.** In the order denying habeas relief, the District Court stated that juror number 3134 was removed by the court for cause prior to the prosecutor's use of any peremptory challenges. *See Williams,* 312 F.Supp.2d at 1274. In fact, juror number 3134 was removed by the defense soon after the first of the prosecutor's peremptory challenges. (*See* RT 117, 232–237.) It appears the District Court may have been referring either to juror number 2604 or juror number 2670, given the transcript pages cited by the court. Thus, a comparative analysis with juror number 3134, who was not removed by the prosecutor, is appropriate.

**14.** As the District Court noted, juror number 2914 was removed by a defense peremptory challenge, *Williams,* 312 F.Supp.2d at 1274 n. 6, but that challenge came only after the prosecutor had passed on the jury containing juror number 2914 four times. (*See* RT 115, 232–35.)

**15.** These percentages remained constant throughout voir dire. By the close of voir dire, 23 of 55 jurors (42%) had no jury experience and 32 of 55(58%) had experience. (RT 142–259.)

dant's counsel asked juror Barnett the following question:

> Counsel: And do you have a—because you have friends or even colleagues that you, I presume, respect these people, they are in law enforcement, do you feel that that makes you feel that police are generally—generally honest, generally no more than the rest of us or certain kinds of law enforcement officers generally tell the truth?
>
> Juror 24: No. I feel they don't.
>
> Counsel: You feel you could be a fair and impartial juror?
>
> Juror 24: Yes.

(RT 223.)

Both the California Court of Appeal and Respondent construe this question and answer as demonstrating a clear anti-police bias. (Lodgment No. 4, at 7–8; Answer, at 12.) This is an objectively unreasonable interpretation of this colloquy. It is far more reasonable to read this exchange as an attempt by a defense attorney to question whether a juror with close ties to law enforcement thought police were more honest or more likely to tell the truth, and the juror's answer as an indication that he believed police were not more honest, especially given that juror Barnett did not answer affirmatively when the trial judge earlier asked the jurors if any of them believed that police were either more or less honest than anyone else. (RT 186.) It is worth noting also that the prosecutor asked no follow-up questions of this juror after this exchange. It stands to reason that if the prosecutor had understood Juror Barnett to be saying that he believed police officers to be less honest, the prosecutor either would have challenged Juror Barnett for cause or asked Juror Barnett additional questions to support a later challenge for cause. The prosecutor did neither.

Thus the "obvious" reasons relied on by the state courts to justify the removal of these three jurors do not illustrate a non-discriminatory motive for the prosecutor's challenges. To the contrary, the record indicates that these reasons were nonsensical or applied inconsistently in a manner that disproportionately impacted African-American jurors. Other non-Black jurors who shared the same "obvious" qualities or possessed qualities even less desirable to the prosecution were not removed by the prosecutor. If having relatives with criminal histories or lacking jury experience or being a loner were reasons enough to remove the Black jurors, then presumably these factors would have been reason enough to require removal of the non-Blacks. That the prosecutor did not exercise his peremptory challenges as to these similarly situated non-Black jurors further suggests that something else—racial discrimination—was at work. *Wade v. Terhune*, 202 F.3d 1190, 1198 (9th Cir.2000); *Miller–El II*, 545 U.S. at 241, 125 S.Ct. 2317.

For all these reasons, the entirety of the record raises an inference of discrimination that has not been dispelled. *Williams*, 432 F.3d 1102; *see also Paulino*, 371 F.3d at 1091–92 (holding that where the state did not provide details of racial make-up of jury, available data raised inference of discrimination based on statistical disparity); *Johnson*, 545 U.S. at 170, 125 S.Ct. 2410 ("[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.").

B. *Race-neutral Reason for Challenges*

 "[O]nce the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168, 125

S.Ct. 2410; *Miller–El II*, 545 U.S. at 239, 125 S.Ct. 2317. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). While the state may satisfy its burden through the use of circumstantial evidence, it must nonetheless articulate the actual reason jurors were removed; mere conjecture cannot satisfy the state's burden. *Johnson*, 545 U.S. at 172, 125 S.Ct. 2410 ("*Batson* framework is designed to produce actual answers to suspicions and inferences [of] discrimination" and this analysis "counsels against engaging in needless and imperfect speculation"); *Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712; *Paulino*, 371 F.3d at 1090 ("[I]t does not matter that the prosecutor might have had good reasons ... [w]hat matters is the *real* reason they were stricken.").

As noted above, the court twice ordered an evidentiary hearing to evaluate any reasons the prosecutor might offer for exercising peremptory strikes against the three African–American jurors. Respondent moved to vacate the hearing and submitted a declaration from the prosecutor stating he had no recollection of the voir dire, had no files or notes regarding the voir dire, and could not supply any information at a hearing in this court. (Motion to Vacate, Exh. D.) Respondent also submitted a declaration from a current employee in the District Attorney's office who stated that Petitioner's case file did not contain any information that would be helpful in discerning the prosecutor's reasons for exercising these challenges. (Motion to Vacate, Exh. E.) Thus, Respondent

has failed to supply this court with any of the actual reasons behind the prosecutor's peremptory challenges.[16]

▮▮▮▮▮ At step two, the State has the burden to offer the actual reasons for the challenges, not to suggest speculative reasons why the prosecutor might have exercised his peremptory challenges. *Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712; *Johnson*, 545 U.S. at 172, 125 S.Ct. 2410; *Paulino*, 371 F.3d at 1090. Thus, the State here has failed entirely to meet its step two burden under *Batson*. Prior to the Supreme court's ruling in *Johnson*, relevant authority suggested that this failure would have ended the *Batson* analysis and required granting relief to the defendant/petitioner.[17] The Ninth Circuit now clearly has rejected this analysis, however, at least in part based on the Supreme Court's opinion in *Johnson*.

▮▮▮ In *Johnson*, the Court wrote:
The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.

*Johnson*, 545 U.S. at 171, 125 S.Ct. 2410 (quotation omitted) (emphasis in original). Further, the opponent of the strike "ultimately carries the burden of persuasion to prove the existence of purposeful discrimination and ... this burden of persuasion rests with, and never shifts from, the opponent of the strike." *Id.* (quotation omitted). Most relevant here, the Court explained,

---

**16.** Although the prosecutor began to state a reason for one of the strikes, the whole of his truncated answer will not be assumed by the court and cannot suffice as an articulated reason under the *Batson* step two analysis.

**17.** This was the court's analysis in its August 2003 recommendation, issued before the Supreme Court's *Johnson* decision.

[i]n the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a strike, the evidence before the judge would consist not only of the original facts from which the prima facie case was established, but also the prosecutor's refusal to justify his strike in light of the court's request.

*Johnson*, 545 U.S. at 171 n. 6, 125 S.Ct. 2410. Thus, it appears the Supreme Court in *Johnson* contemplated a requisite analysis at *Batson*'s third step regardless of whether the State proffered any evidence at step two.

 In *Yee v. Duncan*, 463 F.3d 893 (9th Cir.2006), the Ninth Circuit made this requirement explicit: regardless of the prosecution's failure to articulate a race-neutral reason at step two of the *Batson* analysis, *i.e.*, its failure to meet its burden under the by now familiar three-step *Batson* analysis, a reviewing court must continue on to step three. *Yee*, 463 F.3d at 898–900. As the Ninth Circuit

explained, the "ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." *Id.*, at 897 (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)). Therefore, the State's failure here to articulate the prosecutor's actual race-neutral reasons for the peremptory challenges does not relieve Petitioner of the ultimate burden of proving that discrimination was the motivation behind the prosecutor's strikes.[18] *Yee*, 463 F.3d at 899 ("[S]tep two is an opportunity for the prosecution to explain the real reason for her actions. A failure to satisfy this burden to produce—for whatever reason—becomes evidence that is added to the inference of discrimination raised by the prima facie showing, but it does not end the inquiry.").[19]

## C. *Petitioner's Ultimate Burden of Showing Discrimination*

 Here, then, under Yee, although Respondent has failed to meet its step two burden to produce the actual race-neutral

18. The Ninth Circuit's September 2006 decision in *Yee* superseded its first opinion in the case, which was issued in March 2006 and subsequently withdrawn. *Yee v. Duncan*, 441 F.3d 851 (9th Cir.2006), *opinion withdrawn and superseded*. In the now withdrawn opinion, the court had held that it was "an unreasonable application of clearly established federal law as determined by the Supreme Court [for a court] to uphold the peremptory challenge when the prosecutor failed to provide any explanation for striking" the juror. *Yee*, 441 F.3d at 854. Although the prosecutor in *Yee* could remember her reasons for removing seven of eight jurors, she was unable to remember why she had removed the eighth. *Id.* The Ninth Circuit affirmed the district court's grant of habeas relief because the prosecutor's failure to refute the inference of discrimination raised by the use of the single challenge resulted in a violation of the petitioner's equal protection rights. *Id.*, 441 F.3d at 859–61. This court had relied on the now-withdrawn *Yee* decision to recommend grant-

ing habeas relief in its Second Superseding Report and Recommendation. When *Yee* was withdrawn and superseded, this court necessarily withdrew its Second Superseding Report and Recommendation.

19. This is so even though, as has been long recognized, the burden shifting mechanism described in *Batson* is derived from that developed in Title VII jurisprudence. *Batson*, 476 U.S. at 94 n. 18, 98 n. 21, 106 S.Ct. 1712; *Overton v. Newton*, 295 F.3d 270, 279 n. 10 (2d Cir.2002); *Evans v. Smith*, 220 F.3d 306, 312 (4th Cir.2000); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (describing burden-shifting mechanism), *and compare United States v. Alcantar*, 897 F.2d 436, 438–39 (9th Cir.1990) (reversing defendant's conviction where he made a prima facie showing of discrimination and the prosecutor's rationale could not be adequately tested in a hearing two years after the original trial because of faded memories).

reasons for the challenges, the court must move on to the third step of the *Batson* analysis. At step three, this court has "the duty to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712; *Miller–El II,* 545 U.S. at 239, 125 S.Ct. 2317. In making this determination, this court must consider "all relevant circumstances." *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712; *Miller–El II,* 545 U.S. at 240, 125 S.Ct. 2317.

■■■■ Petitioner's prima facie case was strong. As discussed above, during voir dire, the prosecutor used three of his five total peremptory challenges to remove three of the four available African–American prospective jurors. *See Williams,* 432 F.3d at 1107. Ultimately, the prosecutor excluded 75% of the possible African–Americans; at the time of the objection, the prosecutor had exercised 75% (3 of 4) of his peremptory challenges against African–American jurors. In comparison, African–Americans made up only a small percentage of the first 49 jurors. *Id.* Even if the seated jury contained one Black juror, the statistics of this case remain overwhelming. Of course, this is in combination with the prosecutor's failure to present *any actual* reasons for striking the jurors in question, which the court may consider as evidence supporting the inference of discrimination. *Yee,* 463 F.3d at 899 (failure to provide actual reasons for the challenges—for any reason—is added

to inference of discrimination). Without any compelling evidence to "influence[ ] the starkness of these disparities," *Paulino,* 371 F.3d at 1091, this court is left with no option but to find a *Batson* violation.[20]

■■■■ As explained in detail in sub-section A above, this conclusion does not change when the court considers, at Respondent's earlier urging, the speculative reasons for dismissing these jurors as outlined by the California Court of Appeal. *See Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317 (conducting comparative juror analysis); *but cf. Johnson,* 545 U.S. at 172, 125 S.Ct. 2410 (noting the importance of ascertaining the prosecutor's actual reasons for exercising peremptory strikes). At this step, the court would consider the "persuasiveness" of the proffered reasons, *see Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, and "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317; *Lewis v. Lewis,* 321 F.3d 824, 830 (9th Cir.2003) ("[I]f a review of the record undermines the prosecutor's

**20.** Probably the most compelling circumstantial evidence of benign intent is the prosecutor's earlier acceptance of the jury with one or two African–Americans. It cannot be disregarded though that Petitioner was tried with a co-defendant and both defendants would be exercising peremptory· challenges. Therefore, a prosecutor so inclined reasonably could have assumed that he could safely accept objectionable jurors in the first few rounds of peremptory challenges as the two defendants would be unlikely to both quickly accept the jury. Of course here, the prosecu-

tor ultimately removed both of these jurors and never accepted the jury with juror Barnett. Importantly, the discriminatory exercise of even one peremptory challenge violates the Equal Protection clause. *Paulino,* 371 F.3d at 1092. Since the prosecutor ultimately removed these three jurors (and just two non-Black jurors), the earlier passes on these two jurors, *when both Petitioner and his co-defendant still had all or most of their peremptory challenges to use,* is not compelling evidence of benign intent. *Fernandez,* 286 F.3d at 1079.

stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."); *see also Boyd,* 467 F.3d at 1150 ("[U]nder the clearly established Supreme Court authority of *Batson,* comparative juror analysis is an important tool that courts should utilize on appeal when assessing a defendant's plausible *Batson* claim.").

 As explained above, the speculative and supposedly "obvious" reasons for striking the Black jurors in question either were nonsensical or applied to other non-Black jurors not removed from the jury by the prosecutor. Therefore, this court's comparative juror analysis supports Petitioner's claim that it was discrimination behind the removal of the majority of the Black jurors. *Wade,* 202 F.3d at 1198; *Miller–El II,* 545 U.S. at 241, 125 S.Ct. 2317.

Other circumstances also support Petitioner's case. First, the prosecutor did not engage any of the three Black jurors in questioning before striking them, even though in at least one case the "obvious" reason for striking a juror was a confused answer regarding his ties to police. *Fernandez,* 286 F.3d at 1079. ("Under *Batson,* [a reviewing court] must consider 'all relevant circumstances' surrounding the challenges."; and recognizing that the prosecutor's failure "to engage in meaningful questioning of any of the minority jurors" was one such relevant circumstance.) Second, Petitioner shares a racial identity with the three challenged jurors. *Powers v. Ohio,* 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Third, the trial judge explicitly told the prosecutor that if

he struck another Black juror, defense counsel could renew his *Wheeler* motion, after which the prosecutor did not remove another Black juror. (RT 239–40); *cf. Fernandez,* 286 F.3d at 1079 (noting that the fact that prosecutor removes no more minority jurors after trial court's admonition that additional strikes would result in finding a prima facie case is relevant in determining whether a prima facie case was established).[21] In addition, the timing of the strikes—the use of three of the first four strikes to remove African–Americans—suggests an improper motive behind the challenges.

In sum, these factors plus the strength of the statistical disparity, the failure of the prosecutor to offer any rationale for the strikes, and the unpersuasiveness of the suggested non-racial rationales for the strikes under a comparative juror analysis demonstrate an improper motive for the peremptory challenges at issue. For all of the foregoing reasons, the court finds that Petitioner has carried his ultimate burden of proving purposeful discrimination in the prosecutor's use of peremptory challenges. *Johnson,* 545 U.S. at 171, 125 S.Ct. 2410; *Kesser,* 465 F.3d at 359–60; *McClain v. Prunty,* 217 F.3d 1209, 1220–24 (9th Cir. 2000).

### D. *Application of Teague v. Lane*

 Respondent has argued here, in cursory fashion, that both of the claims in the First Amended Petition are barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). (*See* Answer, at 2, 13, 16.) The *Teague* doctrine is a "nonretroactivity principle" that "prevents a federal court from granting habeas

---

**21.** This court might also have considered the State's refusal to clarify the record as to the racial make-up of the jury as support for Petitioner's claim. *Cf. Johnson,* 545 U.S. at 171 n. 6, 125 S.Ct. 2410 (noting that a prosecutor's refusal to offer reasons for his strikes would support a showing of discrimination).

Respondent has represented to this court that no evidence concerning the racial make-up is available. However, because this court cannot know whether the State truly is without any capacity to gather this data, this court has not held this inability or refusal against Respondent here.

corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). The Supreme Court has stated that, if the *Teague* doctrine is "properly raised by the state," it is a threshold analysis that must be conducted before consideration of the merits of the relevant claims. *Horn v. Banks,* 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (per curiam); *Caspari,* 510 U.S. at 389, 114 S.Ct. 948. Respondent, however, has not identified any Supreme Court holding that would constitute a "new rule" within the meaning of *Teague* (certainly the rule of *Batson,* announced in 1986, was not a "new rule" in 1998), but rather has simply inserted boilerplate sentences to the effect that the doctrine is implicated in some unidentified fashion. (Answer, at 13, 16.) Under such circumstances, the court finds not only that Respondent has not "properly raised" the *Teague* doctrine, but that Respondent's *Teague* argument is patently frivolous. *Smith v. Roe,* 232 F.Supp.2d 1073, 1082 n. 2 (C.D.Cal.2002); *and see also Boyd,* 467 F.3d at 1146 (finding *Teague* did not bar petitioner's *Batson* claim based on Supreme Court's decisions in *Johnson* and *Miller–El*).

## V.

### CLAIM TWO: ALTERCATION INVOLVING DEFENSE WITNESS [22]

Petitioner's second claim is that the trial court violated his constitutional right to a

fair trial when it declined to declare a mistrial after jurors witnessed an altercation involving key defense witness Meredith Mauldin.[23] (First Amended Petition, at 5.) The California Court of Appeal found that Petitioner was not prejudiced by the incident and therefore denied the claim. (Lodgment No. 4, at 8–11.)

Unlike the state court finding underlying Petitioner's first claim, the Court of Appeal's analysis of this claim is entitled to deference under the AEDPA because the state court applied the correct federal legal standard in denying the claim.[24] 28 U.S.C. § 2254(d). The Supreme Court has explained the deferential standard of review under the AEDPA as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable

---

**22.** This court continues to recommend denial of this claim. No substantive changes have been made to this court's earlier recommendation in this section.

**23.** As with Petitioner's first claim, this claim fails to the extent it alleges that the state courts violated Petitioner's rights under the California constitution. 28 U.S.C. § 2254; *Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475.

**24.** The Court of Appeal relied on *People v. Nesler,* 16 Cal.4th 561, 578–79, 66 Cal.Rptr.2d 454, 941 P.2d 87 (1997) in denying Petitioner's claim. In *Nesler,* the California Supreme Court applied Supreme Court and Ninth Circuit precedent to determine whether a defendant was prejudiced by the jury's receipt of extraneous information. *Id.*

application" of Supreme Court precedent if it is "objectively unreasonable" which "requires the State court decision to be more than incorrect or erroneous." *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Ortiz–Sandoval v. Clarke,* 323 F.3d 1165, 1169–70 (9th Cir. 2003). Thus, "an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *accord Price v. Vincent,* 538 U.S. 634, 643, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (even where reviewing court might find that error occurred, habeas relief is not warranted where state court denial of claim is "at least reasonable").

■ Under the AEDPA, circuit law may be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law." *Davis v. Woodford,* 333 F.3d 982, 990–91 (9th Cir. 2003). However, only the Supreme Court's holdings need be reasonably applied by the state courts under the AEDPA. *Andrade,* 538 U.S. at 71–72, 123 S.Ct. 1166.

■ As found by the California Court of Appeal, most of the jurors either saw or heard a verbal and/or physical confrontation between defense alibi witness Mauldin and an unidentified male and/or female in the hallway outside the courtroom before Mauldin's testimony. (Lodgment No. 4, at 8; RT 611–45.) The jurors described the use of angry, profane language but most did not hear the substance of the conversation. (Lodgment No. 4, at 10; RT 611–45.)

The trial court immediately questioned the jurors individually as to what they had heard and whether the incident would affect their ability to remain impartial. (Lodgment No. 4, at 9; RT 611–45.) All but two jurors stated without hesitation that the events would not affect their im-

partiality. (Lodgment No. 4, at 9–11; RT 611–45.) One of the two remaining jurors initially stated that the confrontation would not affect his or her opinion of Mauldin's credibility but when asked again stated that (s)he was unable at that time to answer that question. (Lodgment No 4, at 10 n. 4; RT 626–28.) The other of the two jurors stated that he or she might see Mauldin as "impulsive or violent" but that it would not affect his or her ultimate determination of Mauldin's credibility because "we all have our boiling points." (Lodgment No. 4, at 10–11 n. 4; RT 638–42.) Ultimately all of the jurors, including these two, agreed that they would rely solely on the evidence presented to judge the witnesses' credibility. (Lodgment No. 4, at 10–11; RT 652–54.)

After questioning the jury and hearing argument from counsel, the trial court denied Petitioner's mistrial motion and recalled the jury into the courtroom. (Lodgment No. 4, at 9; RT 645–54.) The trial court then carefully instructed the jurors that they were not to consider anything they had heard in the hallway and that they must decide questions of credibility solely on the evidence presented. (*Id.*) The trial judge accepted the jurors' uniform assurances that they could follow the court's instructions. (*Id.*)

■ A defendant's federal constitutional rights may be violated where the jury considers extraneous information in convicting him. *Mancuso v. Olivarez,* 292 F.3d 939, 949 (9th Cir.2002). This type of constitutional violation, where it occurs, is a trial error that is subject to harmless error analysis on habeas review. *Id.,* 292 F.3d at 949–50. "There is no bright line test for determining whether a defendant has suffered prejudice" when the jury considers extrinsic evidence; therefore, the court should consider all of the circumstances of Petitioner's trial to determine

whether he suffered prejudice. *Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000) (internal quotation omitted). The court must consider "whether there is a direct and rational conclusion between the extrinsic material and a prejudicial jury conclusion" as opposed to a connection that arises only by irrational reasoning. *Mancuso*, 292 F.3d at 953.

The California Court of Appeal reasonably determined that Petitioner was not prejudiced by the jury's observing the confrontation. As that court noted, the jurors either heard nothing substantive or heard statements which had nothing to do with Petitioner's case. *Id.* (no prejudice if no logical connection between extrinsic evidence and petitioner's trial). The events were immediately brought to the court's attention and the court determined that the jurors could remain impartial, even given the initial misgivings of two of the jurors. *Id.* (noting the importance of trial court's determination that no prejudice occurred). The trial court then carefully instructed the jurors that they must not consider the altercation but must judge Mauldin only from the evidence presented in court. *Id.*, 292 F.3d at 952 (jury is presumed to follow court's admonition).

In addition, the evidence against Petitioner was strong; the victim immediately and emphatically identified Petitioner as the man who robbed him. *Compare Sassounian*, 230 F.3d at 1111 (prejudice found where other evidence of guilt is not overwhelming). Finally, it is much more plausible that the reason that the jury discredited Mauldin and Petitioner's fiancee's alibi testimony was that the two waited until trial had already begun—eight months after Petitioner's arrest—before they ever told police, Petitioner's attorney, or anyone else that Petitioner was with them on the night in question and therefore could not have committed the robbery. (*See* Lodgment No. 4, at 12; RT 901, 907.) The

California courts reasonably applied controlling Supreme Court precedent in denying this claim. 28 U.S.C. § 2254(d); *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). Petitioner is not entitled to relief on this claim. 28 U.S.C. § 2254.

## VI.

### RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Third Superseding Report and Recommendation and (2) directing that a conditional writ of habeas corpus be granted.

DATED: January 18, 2008